UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

A.A., BY AND THROUGH HIS
PARENTS AND NEXT FRIENDS,
E.A. AND M.A.,

        Plaintiffs,

v.

WALLED LAKE CONSOLIDATED
SCHOOLS,

        Defendant.
_____/

File No. _____

Hon. _____

MICHIGAN PROTECTION AND
ADVOCACY SERVICE, INC.
Bradley J. Dembs (P76692)
Crystal M. Grant (P71488)
Attorneys for Plaintiffs
4095 Legacy Parkway, Suite 500
Lansing, MI 48911
Phone: (517) 487-1755
bdembs@mpas.org
cgrant@mpas.org
_____/

## COMPLAINT

## I. INTRODUCTION

1.    Plaintiff A.A. ("the Student"), by and through his parents and next friends, E.A. and M.A. ("the Parents") (the Student and the Parents, collectively "Plaintiffs"), brings this civil action against Defendant Walled Lake Consolidated

Schools ("the District"), following receipt of an adverse administrative decision on a due process complaint filed by the District under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* Plaintiffs contend that the District denied the Student a free appropriate public education ("FAPE") in the least restrictive environment ("LRE"), as mandated by the IDEA, 20 U.S.C. § 1412(a)(5), and the federal regulations promulgated pursuant to the IDEA, 34 C.F.R. §§ 300.114, 300.116. Plaintiffs further contend that the conclusion of the Administrative Law Judge ("ALJ") that Plaintiffs did not establish such violations of the IDEA was based upon erroneous factual findings and improper legal conclusions unsupported by the evidence or established law. Finally, Plaintiffs assert that the ALJ committed reversible error by placing the burden of proof on Plaintiffs when Defendant filed the due process complaint against the Student and the Parents.

## II. JURISDICTION AND VENUE

2.     Jurisdiction is conferred upon this Court by 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A), which provide the district courts of the United States with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331, based upon the federal question raised herein, and 28 U.S.C. § 1343, because this action is brought to vindicate Plaintiffs' civil rights

under the IDEA. There is a present and actual controversy between the parties to this action. To the extent required by law, Plaintiffs have exhausted their administrative remedies as to the issues in this action.

3.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiffs reside within the Eastern District of Michigan and all events and omissions giving rise to this Complaint occurred in this district.

### III. PARTIES

4.     Plaintiff A.A. was born on November 30, 2009. He resides with his parents, E.A. and M.A., within the Walled Lake Consolidated School District. A.A. is a child with disabilities, including Down Syndrome and Speech Apraxia. For all times relevant to this Complaint, A.A. was eligible to receive services under the IDEA. 34 C.F.R. § 300.8.

5.     Defendant Walled Lake Consolidated Schools is a local education agency ("LEA") subject to the provisions of, and responsible for providing A.A. a FAPE and the procedural protections required under the IDEA. 20 U.S.C. §§ 1400-1419.

### IV. FACTS

6.     On May 13, 2015, the District held an individualized education program ("IEP") team meeting to address placement and services for A.A. during the 2015-2016 school year. The District decided to place A.A. in a segregated, self-

contained classroom for students with cognitive impairments ("CI classroom"), rather than a general education classroom at his home school, Keith Elementary. The Parents strongly disagreed with this decision and the IEP team did not reach a consensus.

7.     The District reasoned that the benefits of the segregated setting outweighed the benefits of general education, including highly trained teachers and staff with experience in the use of the Student's communication system, specially designed instruction, and low student-to-adult ratio. The District did not explain why these benefits could not be provided in the general education classroom.

8.     In response to the Parent's protests to the placement decision, the District offered a "Trial Placement Agreement." This contract allowed A.A. to remain in the general education environment at his home school for the first marking period of the 2015-2016 school year. In turn, the District demanded that the Parents waive certain rights under the IDEA, including the right to meaningfully participate in the IEP process and the right to have an IEP team meeting to determine placement decisions. The Parents signed the agreement on September 15, 2015. Without another IEP team meeting, A.A.'s placement was changed to the general education classroom at his home school.

9.     A.A. began the 2015-2016 school year in general education, with the supports and services written into his May 2015 IEP being provided in that setting,

including one-on-one instruction in math and reading, visual and social supports, a low-tech AAC system, physical therapy, occupational therapy, social work services, and speech and language services. During this time, A.A. made progress towards the goals in his IEP and was generally successful in general education.

10.    On or about November 9, 2015, the District held a meeting to inform the Parents that A.A. had failed the trial placement. The District thus unilaterally changed A.A.'s placement to the segregated CI classroom without convening an IEP team meeting.

11.    On February 4, 2016, the Parents sought to resolve the dispute over A.A.'s placement by filing a state administrative complaint with the Michigan Department of Education ("MDE"), as provided for by the IDEA and the Michigan Administrative Rules for Special Education ("MARSE"). 34 C.F.R. § 300.153; R. 340.1851. This process is entirely separate from the IDEA's due process complaint and hearing procedures.

12.    On April 1, 2016, the District subverted the Parents' ability to use the IDEA dispute resolution method of their choice by filing a due process hearing request against the Parents on the same issues. The District sought a declaratory judgment that its May 2015 IEP provided A.A. with a FAPE in the least restrictive environment.

13.    On May 12 and 13, 2016, prior to the due process hearing, the District held another IEP team meeting for A.A. and again refused to place him in a general education classroom.

14.    The District claimed that the general education setting would not be appropriate for A.A. in first grade because his skill level was far below that of the first grade curriculum. The District failed to acknowledge the benefits that A.A. had received from being included in general education during his kindergarten year. In fact, during the 2015-2016 school year, A.A. made significant progress toward his goals. By March 2016, he had already achieved two of his speech and language goals, both of his physical therapy goals, and one of his math goals.

15.    The District further reasoned that A.A. would benefit from staff that were trained to address his behavioral, social, and communication needs. The District explained that it believed A.A.'s social and academic skills would improve more quickly if he were in a classroom with students who had comparable disabilities. Again, the District did not consider the portability of these services to the general education setting.

16.    Between May 19 and 23, 2016 the Parents notified the District that they had arranged for independent educational evaluations of A.A. to be completed at the Parents' expense by a Board Certified Behavior Analyst ("BCBA"), a speech and language pathologist, and an inclusion expert. Plaintiffs notified the District

that in-school observations of A.A. would need to take place as part of the evaluations.

17.    The District refused to allow the Parents' evaluators to enter the school, claiming that the Parents did not have the right to schedule observations by private evaluators. On May 26, 2016, Plaintiffs filed an Emergency Motion to Permit Classroom Observations and Request for Expedited Hearing. On June 3, 2016, the ALJ held that the Parents' independent behavior expert and speech and language expert would not be allowed to observe A.A. in school, despite the District's experts having that same privilege.

18.    The District moved to amend its due process complaint against the Parents to include the May 2016 IEP. The ALJ granted this request on June 2, 2016 and the District filed an amended complaint on June 8, 2016.

19.    Ultimately, the issues raised by the District in its amended complaint were whether or not its May 2015 and May 2016 IEPs provided A.A. with a FAPE in the least restrictive environment.

20.    An IDEA due process hearing was convened on July 25, 2016 and continued through August 5, 2016.

21.    As a preliminary matter, at the outset of the hearing, the ALJ declared that "[t]he party requesting the hearing has the burden of persuading the decision

maker that their factual claim is true . . . In this case, the burden is on the District as they filed the due process hearing." *See* Transcript, pp. 10-11.

22.     On September 2, 2016, the ALJ issued a Decision and Order, in which she announced, for the first time, that she had placed the burden of proof on A.A. and the Parents, not the District, as had previously been established. Applying the burden in this manner, the ALJ found that the Parents did not establish, by a preponderance of the evidence, that the May 2015 or May 2016 IEPs denied A.A. a FAPE in the least restrictive environment.

23.     Plaintiffs are aggrieved by this Decision and Order and seek relief as detailed below.

## V. ARGUMENT

### A.     The ALJ Committed Reversible Error by Allocating the Burden of Proof to Plaintiffs

24.     The Supreme Court has held that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

25.     In making this decision, the Court acknowledged that "Congress has never explicitly stated . . . which party should bear the burden of proof at IDEA hearings." *Id*. at 54. As such, the Court relied on "the ordinary default rule that plaintiffs bear the risk of failing to prove their claims." *Id*. at 56. "Perhaps the broadest and most accepted idea is that the person who seeks court action should

justify the request, which means that the plaintiffs bear the burdens on the elements in their claims." C. Mueller & L. Kirkpatrick, Evidence § 3.1, p. 104 (3d ed. 2003).

26.    The Court also pointed out that it regularly applies this traditional rule in various contexts, including cases arising under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the Administrative Procedure Act. *Id*. at 57. The rule is also incorporated into Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. *See Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001).

27.    The Supreme Court's decision in *Schaffer* to abide by the default rule aligns with the pre-existing rule of the Sixth Circuit, which has long held that the plaintiff bears the risk of failing to prove its claims. *See Renner v. Bd. of Educ. of Pub. Sch. of City of Ann Arbor*, 185 F.3d 635 (6th Cir. 1999); *Doe ex rel. Doe v. Bd. of Educ. of Tullahoma City Sch.*, 9 F.3d 455 (6th Cir. 1993); *Cordrey v. Euckert*, 917 F.2d 1460 (6th Cir. 1990); *Doe ex rel. Doe v. Defendant I*, 898 F.2d 1186 (6th Cir. 1990).

28.    In all of these cases, parents filed IDEA due process complaints against their children's school districts. In each case, the Court followed the ordinary default rule that the party who initiates the proceeding bears the burden of proof.

29.    In this case, by contrast, the Parents did not initiate the due process hearing. The District filed an IDEA due process complaint against the Parents in order to obtain relief in the form of a declaratory judgment from the ALJ. The District is the party that called the legality of A.A.'s IEPs into question in due process. The Parents merely responded to the District's due process complaint in an attempt to defend themselves against the claims made therein.

30.    While the ALJ acknowledged that the District brought the action, she erroneously held that the burden should not apply to the District because it was "not challenging the IEP but rather attempting to defend [its] position that the IEP provides the Student with a [FAPE]." (Decision and Order, p. 12).

31.    Here, the ALJ is referring to *Schaffer*, which, after stating that the default rule placing the burden on plaintiffs "applies with equal effect to school districts," gives one specific example: "If they seek to challenge an IEP, they will in turn bear the burden of persuasion before an ALJ." 546 U.S. at 62.

32.    The ALJ's logic is flawed for two reasons. First, the District was in fact "challenging the IEP" by calling it into question in a due process hearing. Confronted with a burden of proof issue similar to the one raised herein, another court held that *Schaffer* requires ALJs to place the burden of proof on school districts when they initiate due process hearings in order to predetermine the

adequacy of their IEPs. *See P.R. v. Shawnee Mission Unified Sch. Dist. No. 512*, No. 11-2217-CM-DJW, 2012 WL 1534793, at *3 (D. Kan. Apr. 30, 2012).

33.     Second, the ALJ disregarded the key point of *Schaffer*, that the burden of proof applies to the plaintiff, be that the parents or the school district. This holding applies more broadly than just to the circumstances arising in *Schaffer*. For example, in its opinion, the *Schaffer* Court mentions two additional scenarios in which a school district can seek a due process hearing: if the school district wishes "to change an existing IEP but the parents do not consent, or if parents refuse to allow their child to be evaluated." 546 U.S. at 53.

34.     It is also well-established under the IDEA that a school district may bring a due process complaint to assert the appropriateness of its own evaluations, in response to parents requesting an independent educational evaluation ("IEE"). The circumstances of the present case closely resemble this situation.

35.     Under the IDEA, parents are entitled to an IEE at public expense if they disagree with an evaluation obtained by their child's school district. 34 C.F.R. § 300.502(b)(1). When a parent requests an IEE, the school district must, without unnecessary delay, either:

> (i) File a due process complaint to request a hearing to show that its evaluation is appropriate; or
>
> (ii) Ensure that an independent educational evaluation is provided at public expense, unless the agency demonstrates in a hearing pursuant to §§ 300.507

> through 300.513 that the evaluation obtained by the parent did not meet
> agency criteria.

34 C.F.R. § 300.502(b)(2). In this scenario, the burden is explicitly placed on the

school district to request a due process hearing to prove that its evaluation was

appropriate.

36.     Another court has acknowledged that school districts bear the burden

of proof when they file due process complaints to avoid conducting IEEs. *See L.P.*

*ex rel. Z.P.S. v. Lake Washington Sch. Dist.*, No. C13-1670JLR, 2014 WL

2048192, at *1 (W.D. Wash. May 19, 2014).

37.     The allocation of the burden of proof in IEE cases is analogous to the

present circumstances. Here, the Parents raised a disagreement with an aspect of

A.A.'s education through a state administrative complaint, one of several means of

dispute resolution available under the IDEA. The District believed it had acted

appropriately and filed a due process hearing request to show that was the case.

The rule articulated by *Schaffer* demands that the burden be placed on the District

to show and prove, as it claims, that its IEP is appropriate.

38.     Furthermore, public policy concerns and fundamental fairness dictate

that the ALJ's Decision and Order must be vacated and remanded in order to apply

the appropriate burden of proof. *See* 2 J. Strong, McCormick on Evidence § 337, p.

415 (5th ed. 1999) (allocation of burden of proof "will depend upon the weight . . .

given to any one or more of several factors, including: . . . special policy

considerations . . . [and] fairness"); 9 J. Wigmore, Evidence § 2486, p. 291 (J. Chadbourn rev. ed. 1981) (assigning burden of proof presents "a question of policy and fairness based on experience in different situations").

39.     The ALJ, having been fully briefed on the issues in dispute, and understanding that the District had brought the complaint against the Parents, affirmed to both parties at the start of the hearing that the District bore the burden of proof. *See* Transcript, pp. 10-11.

40.     The Michigan Administrative Hearing System website also gave the Parents reason to believe that they would not bear the burden of proof in this case. In a Frequently Asked Questions article on special education due process hearings, it states: "In a Due Process Hearing, the burden of proof is on the party bringing the claim." *See* http://www.michigan.gov/lara/0,4601,7-154-10576_77344_77535---,00.html (last visited Nov. 22, 2016).

41.     By shifting the burden to the Parents and failing to notifying them of this change until the Decision and Order was issued, the ALJ misled the Parents and significantly prejudiced their case. The Parents had no opportunity to plan or present their case and argument at the due process hearing with the understanding that they bore the burden of proof.

42.     Therefore, even if it is determined that the burden of proof was on the Parents in this case, fairness dictates that the burden should have stayed on the District after the hearing was conducted under that assumption.

43.     The Decision and Order also has adverse policy implications beyond this case. While school districts have the right to file due process hearing requests under the IDEA, the United States Department of Education Office of Special Education Programs ("OSEP") has strongly recommended they not do so regarding issues that parents have already chosen to address through state administrative complaints. (Exhibit A - *Dear Colleague: Use of Due Process Procedures After a Parent Has Filed a State Complaint*, p. 4, April 15, 2015.)

44.     OSEP reasons that such action, which the District took in this case, "may unreasonably limit parents' dispute resolution options, and force parents either to participate in a potentially more adversarial, lengthy, and costly due process complaint and hearing, or to fail to participate . . . and thereby risk the hearing official's ruling in favor of the [school district]." *Id*.

45.     OSEP "strongly believes that it is in the best interest of parents and school districts to respect parents' choice of forum for resolution of their disputes." *Id.* To do otherwise would be "contrary to Congressional intent in the 2004 amendments to IDEA's dispute resolution procedures [that] give parents and

schools expanded opportunities to resolve their disagreements in positive and constructive ways." *Id.*, citing 20 U.S.C. 1400(c)(8).

46.   In this case, the Parents chose to use the state complaint process instead of filing a due process complaint, yet they were precluded from seeking relief from the MDE and were instead forced into a lengthy and expensive due process hearing by the District.

47.   Interpreting the IDEA to impose a burden of proof on parents when school districts initiate due process hearings would squander Congress's vision of a cooperative process between school districts and parents.

48.   As Justice Ginsburg reasoned in her dissenting opinion in *Schaffer*, "Saddled with a proof burden in administrative due process hearings, parents are likely to find a district-proposed IEP resistant to challenge." 546 U.S. at 65 (Ginsburg, J., dissenting) (internal quotations omitted).

49.   If school districts know that they will not be allocated the burden of proving their own case in due process hearings that they initiate, it will create strong incentives for school districts to not cooperate with parents, and to file for due process, with the assistance of publicly funded attorneys, knowing that the parents will be required to come forward under significant financial costs and time commitments to justify their objections to the IEP.

50.     Such a scenario will often result in unrepresented and overmatched parents, inexperienced in bringing a case in due process, defaulting or failing to prove that their child's IEP is inappropriate.

51.     To force parents into such difficult circumstances when they have already chosen a less complex and adversarial means of resolving a dispute, as the District did here, is fundamentally unfair.

52.     In the present instance, the District bears the burden of proof, in accordance with the holding articulated in *Schaffer*. Public policy considerations and fairness also dictate that the burden be placed on the District, and not the Parents, under the circumstances of this case.

53.     In light of the ALJ's erroneous application of the burden of proof, Plaintiffs hereby request the opportunity to present additional evidence, pursuant to the IDEA. 34 C.F.R. § 300.516(c)(2).

**B.      The ALJ Applied the Wrong Legal Standard for a Least-Restrictive-Environment Analysis in the Sixth Circuit**

54.     The IDEA requires school districts to provide a FAPE to children with disabilities who, because of their impairments, need special education and related services. 20 U.S.C. § 1400(d).

55.     A FAPE must be provided in the least restrictive environment, meaning that children with disabilities must be educated with children who are not disabled to the maximum extent appropriate. A child should not be removed to a

separate school unless the nature and severity of the child's disability is such that education in a general education environment with the use of supplementary aids and services cannot be achieved satisfactorily. 34 C.F.R. § 300.114.

56.     The preference for mainstreaming in the IDEA is clear. *See McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 671–72 (6th Cir. 2003) (describing the IDEA's least-restrictive-environment requirement as a "mandate favoring mainstreaming"); *Roncker ex rel. Roncker v. Walter*, 700 F.2d 1058 (6th Cir. 1983) ("The [IDEA] does not require mainstreaming in every case but its requirement that mainstreaming be provided to the *maximum* extent appropriate indicates a very strong congressional preference.").

57.     In *Roncker*, the Sixth Circuit Court of Appeals set forth the test to be used in cases implicating the IDEA's LRE mandate. "In a case where the segregated facility is considered superior, the court should determine whether the services which make that placement superior could be feasibly provided in a non-segregated setting. If they can, the placement in the segregated school would be inappropriate under the Act." 700 F.2d at 1063.

58.     *Roncker* recognized three scenarios in which placing a student with disabilities in general education would be inappropriate: (1) where the "child would not benefit from mainstreaming"; (2) where "any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which

could not feasibly be provided in the non-segregated setting"; or (3) where the "child is a disruptive force in the non-segregated setting." *Id*.

59. In a recent district court case in the Sixth Circuit, with facts remarkably similar to the present action, the Court applied the *Roncker* standard and reversed the administrative due process decision of an ALJ, holding that a school district's placement of a student with Down Syndrome in a self-contained classroom violated the IDEA's LRE mandate and therefore resulted in a substantive denial of FAPE. *See L.H. v. Hamilton Cty. Dep't of Educ.*, No. 1:14-CV-00126, 2016 WL 6581235 (E.D. Tenn. Nov. 4, 2016).

60. In *L.H.*, the court found that at the due process level, the ALJ had not cited to *Roncker* or otherwise identified the correct legal framework for conducting an LRE analysis in the Sixth Circuit. *Id*. at *18. Similarly here, the ALJ did not reference any case law interpreting the IDEA's LRE mandate.

61. The ALJ did not apply the *Roncker* test when considering this case. Rather, she reasoned that the segregated setting was most appropriate because it already had the supports and services and experienced teachers in place that A.A. needed. This justification is in direct conflict with the legal standard outlined by *Roncker* and the *L.H.* decision.

62. The ALJ did not hold that A.A. fell into any of the three categories established by *Roncker* where inclusion in general education would not be

appropriate. If the ALJ had conducted such an analysis, she would have held for Plaintiffs, as A.A. does not meet any of the three criteria that justify exclusion from general education under the IDEA. As such, the District's proposed placement in the segregated self-contained classroom violates the IDEA's LRE mandate.

### i.   A.A. Can Receive a Benefit from Inclusion in the General Education Environment

63.   At the due process hearing, Plaintiffs presented significant evidence to demonstrate that A.A. could benefit from being included in the general education setting, including expert testimony on the benefits of inclusion (academic, social, and behavioral benefits), as well as testimony and documentary evidence regarding A.A.'s actual progress towards the academic and behavioral goals written into his IEP during the 2015-2016 school year, when he was in a general education classroom.

64.   The District did not deny that A.A. made progress in general education, but claimed that he would always lag behind his non-disabled peers. The District's philosophy, as expressed by multiple teachers, evaluators, and administrators, was that until he mastered certain basic skills, A.A. would not be able to meet grade-level curriculum standards, and should therefore not take part in general education.

65.   However, case law makes it abundantly clear that "a child need not master the general-education curriculum for mainstreaming to remain a viable

option. *L.H.* at \*14 (citing several cases). Rather, "the appropriate yardstick is whether [the child], with appropriate supplemental aids and services, can make progress towards [the child's] IEP goals in the regular education setting" *Id.* at \*15 (quoting *A.S. ex rel. S. v. Norwalk Bd. of Educ.*, 183 F.Supp. 2d 534, 546 (D. Conn. 2002) and citing additional cases).

66.     Indeed, A.A. progressed towards the goals in his May 2015 IEP during his kindergarten year. Yet the District justified its decision to place him in a segregated setting for the following school year by testifying that he would not be able to keep up with the rigor and pace of the first grade curriculum. Again, the recent *L.H.* decision holds that this is not the appropriate consideration in determining whether A.A. could benefit from inclusion in general education. Moreover, the Sixth Circuit has never established "keeping up" with grade level curriculum as a requirement for placement in a general education classroom.

67.     Based upon the evidence offered at the due process hearing, as well as the District's admission that A.A. made progress towards the goals in his IEP, even mastering several of his goals, the ALJ should have determined that inclusion in general education was beneficial to A.A. and that he therefore did not fall under the first exception to mainstreaming under *Roncker*.

      ii.     **Any "Superior Services" of the Segregated Setting Could Also be Provided to A.A. in the General Education Setting**

68.     Under *Roncker*, the Court must also determine whether the services that purportedly make the segregated setting superior "could be feasibly provided in a non-segregated setting." 700 F.2d at 1063. The Court in *L.H.* breaks this inquiry down into three steps:

> First, the Court must identify the supposedly superior services of the non-mainstream setting. Second, the Court must determine whether those services could be provided in a mainstream setting. Finally, if the benefits of the non-mainstream setting are not portable to the non-segregated setting, the Court must determine whether those non-portable benefits far outweigh the benefits of mainstreaming.

2016 WL 6581235, at *19. "If Plaintiffs prevail on either of the latter two steps, they will have established [the student] does not fall in *Roncker*'s second category of students for whom mainstreaming is inappropriate. *Id.*

69.     The District's main justifications for placing A.A. in a segregated, self-contained classroom were (1) the small ratio of students to staff, (2) the specialized knowledge and training of the staff, and (3) the built-in supports in the classroom. These supports and services could all easily be provided in the general education setting.

70.     The District reasoned that as the demands of the general education curriculum grew harder, A.A. would need to be in a smaller group setting so he could work at his own pace. This reasoning ignores that fact that A.A. was already being pulled out of the general education classroom to work on math and reading in a one-on-one setting with a resource room teacher.

71.     In addition, "the IDEA does not require [the student] to keep up with the pace of the regular-education curriculum and of his typically developing peers in order to be mainstreamed." *L.H.* at *21.

72.     Regarding the training and experience of staff in the segregated setting, in comparison to the general education setting, this is the result of the District's own allocation of resources. Simply because the District chose, for example, to place all of its staff members who have experience implementing a behavior plan or a communication device in the segregated CI classroom does not indicate that it would be impossible to make changes going forward. It is highly feasible for the District to assign its employees as necessary, based on the needs of the students in various classes or schools.

Relying on the District's distribution of qualified staff is inappropriate to justify placing A.A. in a more restrictive setting. *See* Comments to 2006 IDEA Regulations ("Public agencies . . . must not make placement decisions based on [their] needs or available resources, including budgetary considerations and the ability of the public agency to hire and recruit qualified staff.") 71 FR 46540, 46587, 2006 WL 2332118.

73.     Furthermore, A.A.,'s May 2015 IEP was drafted by the District with the understanding that he would be placed in a segregated, self-contained classroom. The IEP included supports and services such as one-on-one instruction

in math and reading, occupational therapy, physical therapy, speech and language services, and social work services.

74.   Ultimately, however, the District successfully implemented A.A.'s IEP in the general education setting for the entirety of the 2015-2016 school year, thus clearly demonstrating that the supports and services contained therein could feasibly be provided in that setting.

75.   Multiple witnesses, including an inclusion expert and District staff, testified at the due process hearing that the services A.A. needs could be provided in a general education classroom. Service providers also testified that they would provide similar services to A.A., regardless of his placement.

76.   Finally, any benefits of the self-contained setting that might not be transferrable to the general education classroom do not "far outweigh" the benefits of inclusion for A.A. Testimony from an inclusion expert, a speech and language expert, and behavior experts described a variety of significant benefits that A.A. would derive from inclusion in the general education setting. For example, in general education, A.A. would be subjected to constant modeling by his typically-developing peers, which would allow him to learn appropriate speech, social skills, and behavior.

77.   As such, A.A. does not fall within *Roncker*'s second category of students for whom mainstreaming is inappropriate.

### iii.    A.A. is Not Too Disruptive for the General Education Setting

78.    While A.A. did have some behavior issues in the general education setting during the 2015-2016 school year, this behavior was not so disruptive as to require a separate placement.

79.    In *L.H.*, the student exhibited similar behavior issues to A.A., including invading classmates' personal space, disobeying teachers, and refusing to work on assignments. *L.H.* at \*4. In response, his teachers implemented strategies to reduce these issues, based on their hypothesis of the function of the behavior. Once those strategies were put in place, the student's behavior improved noticeably. *Id.*

80.    Here, on the other hand, the District did not implement any formal interventions or strategies based on evaluations during the 2015-2016 school year. A behavior evaluation ("Functional Behavioral Assessment" or "FBA") was not initiated by the District until well into the second semester of the 2015-2016 school year. The FBA was not completed until the summer after the school year and the District never implemented a behavior intervention plan ("BIP") for A.A.

81.    Testimony from the District's behavior expert indicated that District staff were reinforcing A.A.'s negative behavior. Each behavior expert who testified agreed that A.A. needed a BIP. Therefore, any behavior issues can be attributed, at

least in part, to the District's failure to provide a BIP and lack of a unified strategy and inherent inconsistencies in how District staff responded to A.A. as a result.

82.    If an appropriate BIP were implemented, it is likely that A.A.'s behavior issues would have decreased or disappeared completely. Either way, it is incumbent upon the District to attempt to provide supports and services, such as a BIP, in general education with fidelity before moving A.A. to a more restrictive setting.

83.    Therefore, the third *Roncker* category does not dictate that A.A. should be placed in a segregated setting.

84.    As was the case in *L.H.*, the District "adhered to a standard that was more exacting than the IDEA requires, and as a result, their conclusion [that A.A.] could not be fully mainstreamed and required a more restrictive placement contravene[d] the 'very strong congressional preference' in favor of mainstreaming embodied in the IDEA's least-restrictive-environment mandate." 2016 WL 6581235, at *23 (quoting *Roncker*, 700 F.2d at 1063).

85.    Plaintiffs presented sufficient evidence to establish that the District's May 2015 and May 2016 IEPs failed to provide A.A. with a FAPE in the LRE under the Sixth Circuit standard established in *Roncker*. However, the burden of proof should not have been on Plaintiffs in the first place.

86. If the ALJ had properly placed the burden of proof on the District and applied the correct legal standard under *Roncker*, she would have found that the District did not establish, by a preponderance of the evidence, that its May 2015 or May 2016 IEPs provided A.A. with a FAPE in the LRE.

## VI. REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Issue a declaratory Judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that the ALJ erroneously placed the burden of proof on Plaintiffs,

B. Issue a declaratory Judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that Defendant's May 2015 and May 2016 IEPs failed to provide A.A. with a FAPE in the least restrictive environment;

C. Issue a permanent injunction ordering Defendant to place A.A. in the least restrictive environment, which is the general education classroom at his home school, Keith Elementary;

D. Vacate the September 2, 2016 Decision and Order of the ALJ;

E. Order Defendant to pay Plaintiffs' reasonable attorneys' fees and costs for this action; and

F. Order any other and further relief, both legal and equitable, that this Court may deem just and proper.

Respectfully submitted this 1st day of December, 2016,

E.A. AND M.A., ON BEHALF OF
THEIR SON, A.A.

By their attorneys,

_____/s/ Bradley J. Dembs_____
Bradley J. Dembs (P76692)
Crystal M. Grant (P71488)
Michigan Protection and Advocacy
Service, Inc.
Attorneys for Plaintiffs
4095 Legacy Parkway, Suite 500
Lansing, MI 48911
Phone: (517) 487-1755
bdembs@mpas.org
cgrant@mpas.org