UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

A.A., BY AND THROUGH HIS PARENTS
AND NEXT FRIENDS, E.A. AND M.A.,                   File No. 2:16-CV-14214

     Plaintiffs,                                          Hon. Sean F. Cox
                                                                   District Judge

v.
                                                                   Hon. Mona K. Majzoub
WALLED LAKE CONSOLIDATED                         Magistrate Judge
SCHOOLS,

     Defendant.

_____

MICHIGAN PROTECTION AND                          LUSK & ALBERTSON, PLC
ADVOCACY SERVICE, INC.                             Robert A. Lusk (P38122)
Bradley J. Dembs (P76692)                            Attorney for Defendant
Crystal M. Grant (P71488)                             409 E. Jefferson, Fifth Floor
Attorneys for Plaintiffs                                 Detroit, MI 48226
4095 Legacy Parkway, Suite 500                     (248) 988-5662
Lansing, MI 48911                                      rlusk@luskalbertson.com
(517) 487-1755
bdembs@mpas.org
cgrant@mpas.org

GILBERT RUSSELL MCWHERTER
SCOTT & BOBBITT, PLC
Justin S. Gilbert (TN Bar No. 017079)
Attorney for Plaintiffs
100 W. Martin Luther King Blvd., Suite 504
Chattanooga, TN 37402
(423) 499-3044
jgilbert@gilbertfirm.com
*Admission Pending*

_____

## FIRST AMENDED COMPLAINT

**NOW COME PLAINTIFFS**, by and through counsel, submitting this First Amended Complaint as a matter of course, pursuant to Fed. R. Civ. P. 15(a)(1)(B).

## I.    INTRODUCTION

1.    Plaintiff A.A. ("the Student"), by and through his parents and next friends, E.A. and M.A. ("the Parents") (the Student and the Parents, collectively "Plaintiffs"), brings this civil action against Defendant Walled Lake Consolidated Schools ("the District"), following receipt of an adverse administrative decision on a due process complaint filed by the District under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq*. Plaintiffs contend that the District denied the Student a free appropriate public education ("FAPE") in the least restrictive environment ("LRE"), as mandated by the IDEA, 20 U.S.C. § 1412(a)(5), and the federal regulations promulgated pursuant to the IDEA, 34 C.F.R. §§ 300.114, 300.116. Plaintiffs also assert that the District violated the Student's rights under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. §§ 794 *et seq*.

2.    Plaintiffs contend that the conclusion of the Administrative Law Judge ("ALJ") that Plaintiffs did not establish such violations of the IDEA was based upon erroneous factual findings and improper legal conclusions unsupported

by the evidence or established law. Plaintiffs also assert that the ALJ committed reversible error under the IDEA by placing the burden of proof on Plaintiffs when Defendant filed the due process complaint against Plaintiffs and by changing the Student's stay-put placement during the pendency of the proceedings.

## II.     JURISDICTION AND VENUE

3.     Jurisdiction is conferred upon this Court by 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A), which provide the district courts of the United States with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331, based upon the federal question raised herein, and 28 U.S.C. § 1343, because this action is brought to vindicate Plaintiffs' civil rights under the IDEA. This Court also has jurisdiction under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12188(a), and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. §§ 794 *et seq.* There is a present and actual controversy between the parties to this action. To the extent required by law, Plaintiffs have exhausted their administrative remedies as to the issues in this action.

4.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiffs reside within the Eastern District of Michigan and all events and omissions giving rise to this Complaint occurred in this district.

3

### III.   PARTIES

5.     Plaintiff A.A. was born on November 30, 2009. He resides with his parents, E.A. and M.A., within the Walled Lake Consolidated School District. A.A. is a child with disabilities, including Down syndrome and Speech Apraxia. For all times relevant to this Complaint, A.A. was eligible to receive services under the IDEA. 34 C.F.R. § 300.8.

6.     Defendant Walled Lake Consolidated Schools is a local education agency ("LEA") subject to the provisions of, and responsible for providing A.A. a FAPE and the procedural protections required under the IDEA. 20 U.S.C. §§ 1400-1419.  It receives federal funding for the education of students with disabilities.

### IV.   FACTS

7.     On May 13, 2015, the District held an individualized education program ("IEP") team meeting to address placement and services for A.A. during the 2015-2016 school year. The District decided to place A.A. in a segregated, self-contained classroom for students with cognitive impairments ("CI classroom"), rather than a general education classroom at his home school, Keith Elementary. The Parents strongly disagreed with this decision and the IEP team did not reach a consensus.

8.     The District reasoned that the benefits of the segregated setting outweighed the benefits of general education, including highly trained teachers and

4

staff with experience in the use of the Student's communication system, specially designed instruction, and low student-to-adult ratio. The District did not explain why these benefits could not be provided in the general education classroom.

9.    In response to the Parent's protests to the placement decision, the District offered a "trial placement agreement." This contract allowed A.A. to remain in the general education environment at his home school for the first marking period of the 2015-2016 school year. In turn, the District demanded that the Parents waive certain rights under the IDEA, including the right to meaningfully participate in the IEP process and the right to have an IEP team meeting to determine placement decisions. The Parents signed the agreement on September 15, 2015. Without another IEP team meeting, A.A.'s placement was changed to the general education classroom at his home school.

10.    A.A. began the 2015-2016 school year in general education, with the supports and services written into his May 2015 IEP being provided in that setting, including one-on-one instruction in math and reading, visual and social supports, a low-tech AAC system, physical therapy, occupational therapy, social work services, and speech and language services. During this time, A.A. made progress towards the goals in his IEP and was generally successful in general education.

11.    On or about November 9, 2015, the District held a meeting to inform the Parents that A.A. had failed the trial placement. The District thus unilaterally

sought to change A.A.'s placement to the segregated CI classroom without convening an IEP team meeting.

12.     On February 4, 2016, the Parents sought to resolve the dispute over A.A.'s placement by filing a state administrative complaint with the Michigan Department of Education ("MDE"), as provided for by the IDEA and the Michigan Administrative Rules for Special Education ("MARSE"). 34 C.F.R. § 300.153; R. 340.1851. This process is entirely separate from the IDEA's due process complaint and hearing procedures.

13.     On February 11, 2016, pursuant to its authority under the IDEA and the MARSE, the MDE determined that A.A. should remain in the general education classroom, his then-current educational placement, during the pendency of the state complaint investigation.

14.     On April 1, 2016, the District subverted the Parents' ability to use the IDEA dispute resolution method of their choice by filing a due process hearing request against the Parents on the same issues. The District sought a declaratory judgment that its May 2015 IEP provided A.A. with a FAPE in the least restrictive environment.

15.     On April 18, 2016, Defendant filed a Motion to Establish Stay Put in the due process proceedings. The ALJ issued a new stay-put order affirming that the student should remain in his general education classroom in his home school.

16.     On May 12 and 13, 2016, prior to the due process hearing, the District held another IEP team meeting for A.A. and again refused to place him in a general education classroom.

17.     The District claimed that the general education setting would not be appropriate for A.A. in first grade because his skill level was far below that of the first grade curriculum. The District failed to acknowledge the benefits that A.A. had received from being included in general education during his kindergarten year. In fact, during the 2015-2016 school year, A.A. made significant progress toward his goals. By March 2016, he had already achieved two of his speech and language goals, both of his physical therapy goals, and one of his math goals, and made progress on several others.

18.     The District further reasoned that A.A. would benefit from staff that were trained to address his behavioral, social, and communication needs. The District explained that it believed A.A.'s social and academic skills would improve more quickly if he were in a classroom with students who had comparable disabilities. Again, the District did not consider the portability of these services to the general education setting.

19.     Between May 19 and 23, 2016 the Parents notified the District that they had arranged for independent educational evaluations of A.A. to be completed at the Parents' expense by a Board Certified Behavior Analyst ("BCBA"), a speech

and language pathologist, and an inclusion expert. Plaintiffs notified the District that in-school observations of A.A. would need to take place as part of the evaluations.

20.    The District refused to allow the Parents' evaluators to enter the school, claiming that the Parents did not have the right to schedule observations by private evaluators. On May 26, 2016, Plaintiffs filed an Emergency Motion to Permit Classroom Observations and Request for Expedited Hearing. On June 3, 2016, the ALJ held that the Parents' independent behavior expert and speech and language expert would not be allowed to observe A.A. in school, despite the District's experts having that same privilege.

21.    The District moved to amend its due process complaint against the Parents to include the May 2016 IEP. The ALJ granted this request on June 2, 2016 and the District filed an amended complaint on June 8, 2016.

22.    Ultimately, the issues raised by the District in its amended complaint were whether or not its May 2015 and May 2016 IEPs provided A.A. with a FAPE in the least restrictive environment.

23.    An IDEA due process hearing was convened on July 25, 2016 and continued through August 5, 2016.

24.    As a preliminary matter, at the outset of the hearing, the ALJ declared that "[t]he party requesting the hearing has the burden of persuading the decision

8

maker that their factual claim is true . . . In this case, the burden is on the District as they filed the due process hearing." (Exhibit A, Transcript, pp. 10-11).

25.    On September 2, 2016, the ALJ issued a Decision and Order, in which she announced, for the first time, that she had placed the burden of proof on A.A. and the Parents, not the District, as had previously been established. Applying the burden in this manner, the ALJ found that the Parents did not establish, by a preponderance of the evidence, that the May 2015 or May 2016 IEPs denied A.A. a FAPE in the least restrictive environment.

26.    The ALJ also changed A.A.'s stay-put placement from general education to the segregated CI classroom, which he has never attended, "during any further proceedings in this matter." (Exhibit B, Decision and Order, p. 53).

27.    On September 2, 2016, the Parents revoked consent for special education and related services in order to prevent the District from moving A.A. to the CI classroom.

28.    On September 9, 2016, the Parents requested services for A.A. under Section 504 and/or the ADA.

29.    On September 16, 2016, the District denied the Parents' request for services under Section 504 and/or the ADA.

30.    Plaintiffs are aggrieved by this Decision and Order and seek relief as detailed below.

## V.   LEGAL BASES FOR REVIEW

### A.   The ALJ Committed Reversible Error by Allocating the Burden of Proof to Plaintiffs

31.    The Supreme Court has held that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

32.    In this case, the Parents did not initiate the due process hearing. The District filed an IDEA due process complaint against the Parents in order to obtain relief in the form of a declaratory judgment from the ALJ. The District is the party that called the legality of A.A.'s IEPs into question in due process. The Parents merely responded to the District's due process complaint in an attempt to defend themselves against the claims made therein.

33.    While the ALJ acknowledged that the District brought the action, she erroneously held that the burden should not apply to the District because it was "not challenging the IEP but rather attempting to defend [its] position that the IEP provides the Student with a [FAPE]." (Exhibit B, p. 12).

34.    The rule articulated by *Schaffer* demands that the burden be placed on the District to show and prove, as it claims, that its IEP is appropriate. Public policy considerations and fairness also dictate that the burden be placed on the District, and not the Parents, under the circumstances of this case.

**B.     IDEA: The District Did Not Provide A.A. With Necessary Supports**

35.     Under the IDEA, the District is required to offer A.A. appropriate supports and services to enable him to receive a "free *appropriate* public education."   This includes, particularly, behavioral supports and a behavior intervention plan ("BIP").

36.     Behavioral supports are critical for many children with Down syndrome.  According to the National Down Syndrome Society, common behavioral challenges for many children with Down syndrome include wandering/running off, stubborn/oppositional behavior, attention problems, and obsessive/compulsive behaviors.[1]

37.     At no time did the District provide A.A. with the appropriate behavioral supports. Therefore, A.A. was denied a FAPE and, as shown below, his behavior was used *offensively* by the District to justify its decision to place him in a more restrictive setting than necessary.

**C.     IDEA: The ALJ Applied the Wrong Legal Standard for a Least-Restrictive-Environment Analysis in the Sixth Circuit**

38.     Under the IDEA, in a section entitled "Least Restrictive Environment," the statute mandates that, "[t]o the maximum extent appropriate,

---

[1] *See NDSS: Managing Behavior: What Are Some Behavioral Challenges Typical in Persons with Down Syndrome?* Available at http://www.ndss.org/Resources/Wellness/Managing-Behavior/ (last visited January 9, 2016)

children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). *See also* 34 C.F.R. § 300.114(a)(2).

39.    "Supplementary aids and services" are defined as "aids, services, and other supports that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with non-disabled children to the maximum extent appropriate." 20 U.S.C. § 1401(33).

40.    "Supplementary aids and services" include "specially designed instruction," 20 U.S.C. § 1401(29)(a), positive behavioral interventions and supports, 20 U.S.C. § 1414(d)(3)(B)(i), communication services, 20 U.S.C. § 1414(d)(3)(B)(iv), assistive technology, 20 U.S.C. § 1414(d)(3)(B)(v), and "related services," 20 U.S.C. § 1401(26), which are defined as "developmental, corrective, and other supportive services" and include speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, social work services, school nurse services, counseling services, orientation and mobility services,

and  medical services. *Id.*

41.    Each child with a disability must be "educated in the school that he or she would attend if nondisabled," unless the child's IEP requires some other arrangement. 34 C.F.R. § 300.116(c).

42.    An IEP must be developed for each eligible child with a disability and must contain "academic and functional goals designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum." 20 U.S.C. § 1414(d)(1)(A)(i)(II)(aa). The IEP must provide special education and supplementary aids and services that will allow the child to "be involved in and make progress in the general education curriculum," 20 U.S.C. § 1414(d)(1)(A)(i)(IV)(bb) and "be educated and participate with  .  .  . nondisabled children." 20  U.S.C. § 1414(d)(1)(A)(i)(IV)(cc).

43.    The State and the LEA must ensure that each child with a disability is "not removed from education in age-appropriate regular classrooms solely because of needed modifications in  the general education curriculum." 34 C.F.R. § 300.116(e).

44.    In order to ensure that children are placed in the "least restrictive environment," each placement decision must be "made by a group of persons, including the parents, and other persons knowledgeable about the child, the

meaning of the evaluation data, and the placement options." 34 C.F.R. § 300.116(a)(1).

45.     The United States Supreme Court has recognized the IDEA's mandate to States to "educate handicapped children with non-handicapped children whenever possible," *Board of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 202 (1982), and that States must "'mainstream' disabled children, i.e., . . . educate them with children who are not disabled, and . . . segregate or otherwise remove such children from the regular classroom setting 'only when the nature or severity of the handicap is such that education in regular classes . . . cannot be achieved satisfactorily.'" *Honig v. Doe*, 484 U.S. 305, 311 (1988) (citations omitted). *See also School Committee of Town of Burlington v. Department of Educ.*, 471 U.S. 359, 373 (1985) (noting Congress's recognition when passing IDEA's precursor of the "widespread practice of relegating handicapped children to private institutions or warehousing them in special classes").

46.     This preference for mainstreaming in the IDEA is clear in the case law as well. *See McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 671–72 (6th Cir. 2003) (describing the IDEA's least-restrictive-environment requirement as a "mandate favoring mainstreaming"); *Roncker ex rel. Roncker v. Walter*, 700 F.2d 1058 (6th Cir. 1983) ("The [IDEA] does not require mainstreaming in every case

but its requirement that mainstreaming be provided to the *maximum* extent appropriate indicates a very strong congressional preference.").

47.    In *Roncker*, the Sixth Circuit Court of Appeals set forth the test to be used in cases implicating the IDEA's LRE mandate: "In a case where the segregated facility is considered superior, the court should determine whether the services which make that placement superior could be feasibly provided in a non-segregated setting. If they can, the placement in the segregated school would be inappropriate under the Act." 700 F.2d at 1063.

48.    *Roncker* recognized three scenarios in which placing a student with disabilities in general education would be inappropriate: (1) where the "child would not benefit from mainstreaming"; (2) where "any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting"; or (3) where the "child is a disruptive force in the non-segregated setting." *Id.*

49.    In a recent district court case in the Sixth Circuit, with facts remarkably similar to the present action, the Court applied the *Roncker* standard and reversed the administrative due process decision of an ALJ, holding that a school district's placement of a student with Down syndrome in a self-contained classroom violated the IDEA's LRE mandate and therefore resulted in a

substantive denial of FAPE. *See L.H. v. Hamilton Cty. Dep't of Educ.*, No. 1:14-CV-00126, 2016 WL 6581235 (E.D. Tenn. Nov. 4, 2016).

50.     In *L.H.*, the court found that at the due process level, the ALJ had not cited to *Roncker* or otherwise identified the correct legal framework for conducting an LRE analysis in the Sixth Circuit. *Id*. at *18. Similarly in the present case, the ALJ did not reference any case law interpreting the IDEA's LRE mandate.

51.     The ALJ did not apply the *Roncker* test, as required when considering the LRE dispute in this case. Rather, she reasoned that a more restrictive, segregated setting was most appropriate because it already had the supports and services and experienced teachers in place that A.A. needed. This justification is in direct conflict with the legal standard outlined by *Roncker* and the *L.H.* decision.

52.     The ALJ did not hold that A.A. fell into any of the three categories established by *Roncker* where inclusion in general education would not be appropriate. If the ALJ had conducted such an analysis, she would have held for Plaintiffs, as A.A. does not meet any of the three criteria that justify exclusion from general education under the IDEA. As such, the District's proposed placement in a segregated self-contained classroom, and the ALJ's decision upholding that placement, violates the IDEA's LRE mandate.

### i.     A.A. Can Receive a Benefit from Inclusion in the General Education Environment

53.     At the due process hearing, Plaintiffs presented significant evidence to demonstrate that A.A. could benefit from being included in the general education setting, including expert testimony on the benefits of inclusion (academic, social, and behavioral benefits), as well as testimony and documentary evidence regarding A.A.'s actual progress towards the academic and behavioral goals written into his IEP during the 2015-2016 school year, when he was in a general education classroom.

54.     The District did not deny that A.A. made progress in general education, but claimed that he would always lag behind his non-disabled peers. The District's philosophy, as expressed by multiple teachers, evaluators, and administrators, was that until he mastered certain basic skills, A.A. would not be able to meet grade-level curriculum standards, and should therefore not take part in general education.

55.     However, case law makes it abundantly clear that "a child need not master the general-education curriculum for mainstreaming to remain a viable option. *L.H.* at *14 (citing several cases). Rather, "the appropriate yardstick is whether [the child], with appropriate supplemental aids and services, can make progress towards [the child's] IEP goals in the regular education setting" *Id*. at *15

17

(quoting *A.S. ex rel. S. v. Norwalk Bd. of Educ.*, 183 F.Supp. 2d 534, 546 (D. Conn. 2002) and citing additional cases).

56.     Indeed, A.A. progressed towards the goals in his May 2015 IEP during his kindergarten year. Yet the District justified its decision to place him in a segregated setting for the following school year by testifying that he would not be able to keep up with the rigor and pace of the first grade curriculum. Again, the recent *L.H.* decision holds that this is not the appropriate consideration in determining whether A.A. could benefit from inclusion in general education. Moreover, the Sixth Circuit has never established "keeping up" with grade level curriculum as a requirement for placement in a general education classroom.

57.     Based upon the evidence offered at the due process hearing, as well as the District's admission that A.A. made progress towards the goals in his IEP, even mastering several of his goals, the ALJ should have determined that inclusion in general education was beneficial to A.A. and that he therefore did not fall under the first exception to mainstreaming under *Roncker*.

### ii.     Any "Superior Services" of the Segregated Setting Could Also be Provided to A.A. in the General Education Setting

58.     Under *Roncker*, the Court must also determine whether the services that purportedly make the segregated setting superior "could be feasibly provided in a non-segregated setting." 700 F.2d at 1063. The Court in *L.H.* breaks this inquiry down into three steps:

First, the Court must identify the supposedly superior services of the non-mainstream setting. Second, the Court must determine whether those services could be provided in a mainstream setting. Finally, if the benefits of the non-mainstream setting are not portable to the non-segregated setting, the Court must determine whether those non-portable benefits far outweigh the benefits of mainstreaming.

2016 WL 6581235, at *19. "If Plaintiffs prevail on either of the latter two steps, they will have established [the student] does not fall in *Roncker*'s second category of students for whom mainstreaming is inappropriate. *Id.*

59.    The District's main justifications for placing A.A. in the segregated CI classroom were (1) the small ratio of students to staff, (2) the specialized knowledge and training of the staff, and (3) the built-in supports in the classroom. However, these supports and services could all easily be provided in the general education setting.

60.    The District reasoned that as the demands of the general education curriculum grew harder, A.A. would need to be in a smaller group setting so he could work at his own pace. This reasoning ignores that fact that A.A. was already being pulled out of the general education classroom to work on math and reading in a one-on-one setting with a resource room teacher.

61.    In addition, "the IDEA does not require [the student] to keep up with the pace of the regular-education curriculum and of his typically developing peers in order to be mainstreamed." *L.H.* at *21.

62.     Regarding the training and experience of staff in the segregated setting, in comparison to the general education setting, this is the result of the District's own allocation of resources. Simply because the District chose, for example, to place all of its staff members who have experience implementing a behavior plan or a communication device in the segregated CI classroom does not indicate that it would be impossible to make changes going forward. It is highly feasible for the District to assign its employees as necessary, based on the needs of the students in various classes or schools.

63.     Relying on the District's distribution of qualified staff is inappropriate to justify placing A.A. in a more restrictive setting. *See* Comments to 2006 IDEA Regulations ("Public agencies . . . must not make placement decisions based on [their] needs or available resources, including budgetary considerations and the ability of the public agency to hire and recruit qualified staff.") 71 FR 46540, 46587, 2006 WL 2332118.

64.     Furthermore, A.A.'s May 2015 IEP called for placement in the CI classroom, yet the District successfully provided A.A. with all the supports and services prescribed in the IEP in the general education setting for the entirety of the 2015-2016 school year, thus clearly demonstrating that such supports and services could feasibly be provided in that setting.

65.     Multiple witnesses, including an inclusion expert and District staff, testified at the due process hearing that the services A.A. needs could be provided in a general education classroom. Service providers also testified that they would provide similar services to A.A., regardless of his placement.

66.     Finally, any benefits of the self-contained setting that might not be transferrable to the general education classroom do not "far outweigh" the benefits of inclusion for A.A. Testimony from an inclusion expert, a speech and language expert, and behavior experts described a variety of significant benefits that A.A. would derive from inclusion in the general education setting. For example, in general education, A.A. would be subjected to constant modeling by his typically-developing peers, which would allow him to learn appropriate speech, social skills, and behavior.

67.     As such, A.A. does not fall within *Roncker*'s second category of students for whom mainstreaming is inappropriate.

### iii.     A.A. is Not Too Disruptive for the General Education Setting

68.     While A.A. did have some behavior issues in the general education setting during the 2015-2016 school year, this behavior was not so disruptive as to require a separate placement.

69.     In *L.H.*, the student exhibited similar behavior issues to A.A., including invading classmates' personal space, disobeying teachers, and refusing to

work on assignments. *L.H.* at *4. In response, his teachers implemented strategies to reduce these issues, based on their hypothesis of the function of the behavior. Once those strategies were put in place, the student's behavior improved noticeably. *Id.*

70.     Here, on the other hand, the District did not implement any formal interventions or strategies based on evaluations during the 2015-2016 school year. A behavior evaluation ("Functional Behavioral Assessment" or "FBA") was not initiated by the District until well into the second semester of the 2015-2016 school year and was not completed until the summer after the school year ended. Moreover, the District never implemented a behavior intervention plan ("BIP") for A.A.

71.     Testimony from the District's own behavior expert indicated that District staff were reinforcing A.A.'s negative behavior. Each behavior expert who testified agreed that A.A. needed a BIP. Therefore, any behavior issues can be attributed, at least in part, to the District's failure to provide a BIP and lack of a unified strategy and inherent inconsistencies in how District staff responded to A.A. as a result.

72.     If an appropriate BIP were implemented, it is likely that A.A.'s behavior issues would have decreased or disappeared completely. Either way, it is incumbent upon the District to attempt to provide supports and services, such as a

BIP, in general education with fidelity before moving A.A. to a more restrictive setting.

73.     Therefore, the third *Roncker* category does not dictate that A.A. should be placed in a segregated setting.

74.     As was the case in *L.H.*, the District "adhered to a standard that was more exacting than the IDEA requires, and as a result, their conclusion [that A.A.] could not be fully mainstreamed and required a more restrictive placement contravene[d] the 'very strong congressional preference' in favor of mainstreaming embodied in the IDEA's least-restrictive-environment mandate." 2016 WL 6581235, at *23 (quoting *Roncker*, 700 F.2d at 1063).

75.     Plaintiffs presented sufficient evidence to establish that the District's May 2015 and May 2016 IEPs failed to provide A.A. with a FAPE in the LRE under the Sixth Circuit standard established in *Roncker*. However, the burden of proof should not have been on Plaintiffs in the first place.

76.     If the ALJ had properly placed the burden of proof on the District and applied the correct legal standard under *Roncker*, she would have found that the District did not establish that its May 2015 or May 2016 IEPs provided A.A. with a FAPE in the LRE.

**D.      IDEA: The ALJ Erred by Changing the Original Stay-Put Order**

77.      The IDEA provides that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . ." 20 U.S.C. § 1415(j).

78.      Such proceedings include a civil action in a District Court of the United States, brought by a party aggrieved by a decision made in a due process hearing. 20 U.S.C. § 1415(i)(2); *Kari H. ex rel. Dan H. v. Franklin Special Sch. Dist.*, 125 F.3d 855 at *6 (6th Cir. 1997). As such, pursuant to the IDEA, stay-put extends throughout the pendency of a case, from due process to an appeal of an adverse decision in District Court.

79.      The purpose of this stay-put provision is to protect the parent and child and maintain the status quo. *See Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 625 (6th Cir. 1990) ("the term ['stay-put'] connotes preservation of the status quo"); *M.R. v. Ridley Sch. Dist.*, 744 F.3d 112, 125 (3d Cir. 2014) ("stay-put provision is designed to ensure educational stability for children with disabilities until the dispute over their placement is resolved"); *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1040 (9th Cir. 2009) ("[T]he stay put provision acts as a powerful protective measure to prevent disruption of the child's education throughout the dispute process").

80.    The IDEA does not provide any authority for an ALJ to change a previously established stay-put placement either post-hearing or at any point during the pendency of a case. As such, the ALJ exceeded her authority by amending A.A.'s stay-put placement in her post-hearing Decision and Order, in direct contravention of the purpose of the IDEA.

### E.    Title II of the ADA: Unnecessary Segregation

81.    Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II further prohibits the unnecessary segregation of persons with disabilities. *See Id.*; *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999).

82.    Plaintiff is an otherwise qualified "individual with a disability" under Title II, as his impairments of Down syndrome and Speech Apraxia substantially limit him in the major life activities of learning, thinking, perceiving, communicating, speech, and coordination.

83.    The chief purpose of the ADA is to end discrimination against, and the isolation of, individuals with disabilities. As Congress stated in the findings and purpose section of the ADA: "[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such

25

forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Congress further found that discrimination against individuals with disabilities persisted in education and access to public services, and that such individuals faced various forms of discrimination, including "segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. §§ 12101(a)(3), (a)(5).

84.    Title II of the ADA therefore prohibits discrimination on the basis of disability by public entities. *See* 42 U.S.C. § 12132. A "public entity" is any State or *local government* and any department, agency, or other instrumentality of a State or local government, and covers all services, programs, and activities provided or made available by public entities, including through contractual, licensing, or other arrangements. *See Id*. §§ 12131(1), 12132; 28 C.F.R. § 35.130. Accordingly, Title II's coverage extends to Defendant.

85.    Congress directed the Attorney General to issue regulations implementing Title II of the ADA. *See* 42 U.S.C. § 12134. These regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). "The most integrated setting" means a setting

that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . ." *See Id.* pt. 35, app. B at 690.

86.     Title II's regulations further prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination, including unnecessary segregation, or "that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . ." *Id.* § 35.130(b)(3).

87.     The Supreme Court has held that Title II prohibits the unjustified segregation of individuals with disabilities in the provision of public services. *See Olmstead*, 527 U.S. at 597. Unjustified isolation of persons with disabilities who, with reasonable modifications, could participate in an integrated setting is unlawful discrimination because (1) segregation "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life," and (2) segregation "severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600-01.

88.     The District's failure to provide A.A. with appropriate behavioral supports and services (a reasonable accommodation), its attempts to unnecessarily use his behavior offensively to justify segregation, and its demand for unjustified

segregation of A.A. in a self-contained classroom setting with only other students with disabilities violates Title II of the ADA.

### F.     Section 504: Unnecessary Segregation

89.     In enacting the Rehabilitation Act, 29 U.S.C. § 701 et seq., Congress found that disability is a natural part of the human experience, and in no way diminishes the right of individuals to enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society, 29 U.S.C. § 701(a)(3)(F), and declared its policy that all programs, projects, and activities receiving federal financial assistance shall be carried out in a manner consistent with the principles of inclusion, integration, and full participation of the individuals, 29 U.S.C. § 701(c)(3).

90.     In fact, the purpose of the Rehabilitation Act, which includes Section 504, is to "empower individuals with disabilities to maximize . . . inclusion and integration into society," 29 U.S.C. § 701(b)(1), and the "goals of the Nation" include "providing individuals with disabilities with the tools necessary to . . . achieve full inclusion and integration in society." 29 U.S.C. § 701(a)(6)(B).

91.     Section 504 mandates that no otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.  29 U.S.C.

§ 794(a).

92.    A student with a disability is one who has a physical or mental impairment, including a physiological disorder or condition, cosmetic disfigurement,  or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organ, respiratory, including speech organs, cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, or endocrine; or a mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities who have, have had, or are perceived to have a physical or mental impairment which substantially limits one or more major life activities. 34 C.F.R. §§  104.3(j)(1), (2)(i), (iii) and (iv).

93.    Major life activities include: learning, caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, and working. 34 C.F.R. § 104.1(j)(ii).

94.    A student with a disability between the ages of three and twenty-one is an "otherwise qualified individual" under Section 504 for purposes of receipt of educational services.  34 C.F.R. § 104.3(k)(2).

95.    As with Title II, Plaintiff is an otherwise qualified "individual with a disability" under Section 504, as his impairments of Down syndrome and Speech

29

Apraxia substantially limit him in the major life activities of learning, thinking, perceiving, communicating, speech, and coordination.

96.    A school district, like Defendant, must provide each student with a disability with a FAPE, regardless of the nature or severity of the student's disability.  34 C.F.R. § 104.33(a).

97.    FAPE is defined differently under Section 504 than under the IDEA. Under Section 504, FAPE is defined as the provision of general or special education and related aids and services that are designed to meet the individual educational needs of children with disabilities as adequately as the needs of nondisabled children are met.  34 C.F.R. § 104.33(b)(1).

98.    Section 504 requires that each student with a disability be provided an education with persons who do not have disabilities to the maximum extent appropriate, and be placed in the general education environment, unless that cannot be achieved satisfactorily.  34 C.F.R. § 104.34(a).

99.    Section 504 does not allow for educational placements made out of convenience. "Despite the existence of separate or different . . . services . . . , a recipient may not deny a qualified handicapped person the opportunity to participate in such . . . services that are not separate or different."  34 C.F.R. § 104.4(b)(3).

100.   The District has violated A.A.'s rights under Section 504 by failing to provide him with appropriate behavioral supports and services (a reasonable accommodation), attempting to unnecessarily use his behavior offensively to justify segregation, and demanding that he be unjustifiably segregated in a self-contained classroom setting with only other students with disabilities.

## VI.   REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.   Issue a declaratory Judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that the ALJ erroneously placed the burden of proof on Plaintiffs,

B.   Issue a declaratory judgment pursuant to 28 U.S.C. §§2201 and 2202 that Defendant denied A.A. necessary supports and services, including behavioral supports;

C.   Issue a declaratory Judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that Defendant's May 2015 and May 2016 IEPs failed to provide A.A. with a FAPE in the least restrictive environment;

D.   Issue a declaratory Judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that Defendant's attempts to place A.A. in a segregated, self-contained classroom were unjustified and unlawful under Title II of the ADA and Section 504;

E.     Issue a preliminary injunction ordering Defendant to return A.A. to his pre-hearing stay-put placement in the general education classroom at his home school, Keith Elementary, during the pendency of these proceedings;

F.     Issue a permanent injunction ordering Defendant to place A.A. in the least restrictive environment, which is the general education classroom at his home school, Keith Elementary;

G.     Vacate the September 2, 2016 Decision and Order of the ALJ;

H.     Order Defendant to pay Plaintiffs' reasonable attorneys' fees and costs for this action; and

I.     Order any other and further relief, both legal and equitable, that this Court may deem just and proper.

Respectfully submitted this 12th day of January, 2017,

                              E.A. AND M.A., ON BEHALF OF
                              THEIR SON, A.A.

                              By their attorneys,


                                    */s/ Bradley J. Dembs*
                              Bradley J. Dembs (P76692)
                              Crystal M. Grant (P71488)
                              Michigan Protection and Advocacy
                              Service, Inc.
                              Attorneys for Plaintiffs
                              4095 Legacy Parkway, Suite 500
                              Lansing, MI 48911
                              (517) 487-1755
                              bdembs@mpas.org
                              cgrant@mpas.org

*/s/ Justin S. Gilbert*

Justin S. Gilbert (TN Bar No. 017079)
Gilbert Russell McWherter Scott &
Bobbitt, PLC
Attorney for Plaintiffs
100 W. Martin Luther King Blvd., Suite 504
Chattanooga, TN 37402
(423) 499-3044
jgilbert@gilbertfirm.com
*Admission Pending*

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2017, I electronically filed the above document with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

*/s/ Bradley J. Dembs*

Bradley J. Dembs (P76692)
Crystal M. Grant (P71488)
Michigan Protection and Advocacy
Service, Inc.
Attorneys for Plaintiffs
4095 Legacy Parkway, Suite 500
Lansing, MI 48911
(517) 487-1755
bdembs@mpas.org
cgrant@mpas.org