# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

_____

A.A., by and through his Parents and
Next Friends, E.A. and M.A.,

      Plaintiffs,

v.

WALLED LAKE CONSOLIDATED,
SCHOOLS,

      Defendant.

Case No. 16-14214

Hon. Sean F. Cox
District Judge

Hon. Mona K. Majzoub
Magistrate Judge

_____

**MICHIGAN PROTECTION AND
ADVOCACY SERVICE, INC.**
Bradley J. Dembs (P76692)
Attorney for Plaintiffs
155 N. Michigan Ave., Suite 715
Chicago, IL 60601
(866) 787-9270
bradspedlaw@gmail.com

**LUSK & ALBERTSON, PLC**
Robert A. Lusk (P38122)
Attorney for Defendant/Third-
Party Plaintiff
409 E. Jefferson, Fifth Floor
Detroit, MI 48226
(248) 988-5662
rlusk@luskalbertson.com

**GILBERT MCWHERTER
SCOTT & BOBBITT, PLC**
Justin S. Gilbert (TN Bar #017079)
Attorney for Plaintiffs
200 W. Martin Luther King Blvd.
Suite 1067
Chattanooga, TN 37402
(423) 499-3044
jgilbert@gilbertfirm.com

**UNIVERSITY OF MICHIGAN
LAW SCHOOL PEDIATRIC
ADVOCACY CLINIC**
Crystal M. Grant (P71488)
Casey Thomson (LR 83.21)
Perry Friedlander (LR 83.21)
Attorneys for Plaintiffs
2076 South Hall, 701 S. State Street
Ann Arbor, MI 48109
(734) 763-1947
cgrantjd@umich.edu

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

Table of Contents ................................................................................. i

Table of Authorities ........................................................................... iii

Statement of Issues .............................................................................. 1

Statement of Material Facts Not in Dispute ........................................ 1

Statement of Material Facts in the Additional Evidence Submitted by Plaintiffs .... 1

Standard of Review: Modified *De Novo* ............................................ 13

Argument ............................................................................................ 16

   I.  Substantive Violations of the IDEA .......................................... 16

      A. The ALJ Misaligned the Burden of Proof ............................. 16

      B. The District Failed to Provide A.A. With a Free Appropriate Public Education ...................................................................... 18

         1. The District Failed to use A.A.'s Communication Device with Fidelity in the General Education Classroom ................................................. 18

         2. The District did not Provide A.A. with an FBA or BIP in the General Education Classroom ....................................................... 20

      C. The Least Restrictive Environment Mandate of the IDEA Requires Placement in the General Education Setting with Supplementary Aids and Services Statement of Issues ................................................. 23

      D. The District Cannot Overcome the LRE Mandate ................. 25

E.  The District Cannot Overcome the *Roncker* Standard ......................... 28

   1.  A.A. Benefits From Inclusion in the General Education Setting ....... 30

      a.  Evidence that A.A. has Benefitted from Placement in the General Education Setting ......................................................... 30

      b.  The ALJ Used the Wrong Standard for Progress ........................ 33

   2.  The Segregated Setting is not Superior, and any Perceived Benefits of the Segregated Setting can be Provided in the General Education Setting Statement of Issues ............................................... 36

   3.  A.A. was not too Disruptive in the General Education Setting ......... 42

F.  IDEA Conclusion ................................................................... 44

II. Section 504 and Title II of the ADA ............................................. 45

  A. The Least Restrictive Environment Requirement of Section 504 .......... 45

  B. The Integration Mandate of Title II of the ADA ................................. 47

Conclusion and Relief Requested .......................................................... 49

Certificate of Service ........................................................................ 50

# TABLE OF AUTHORITIES

## Cases

*A.S. v. Norwalk Bd. of Educ.*
   183 F. Supp. 2d 534 (D. Conn. 2002)................................................................. 35

*Andrew M. v. Del. Cty. Office of Mental Health & Mental Retardation*
   490 F.3d 337, 350 (3d Cir. 2007)................................................................. 46, 47

*B.H. v. West Clermont Bd. of Educ.*
   788 F.Supp.2d 682 (S.D. Ohio 2011)................................................................. 21

*Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*
   458 U.S. 176 (1982)......................................................................... *passim*

*Bookout v. Bellflower Unified School District*
   63 IDELR 4 (C.D. Cal. 2014)......................................................................... 39

*Burilovich v. Bd. of Educ. of Lincoln Consolidated Schs.*
   208 F.3d 560 (6th Cir. 2000) ......................................................................... 1

*Daniel R.R. v. State Bd. of Educ.*
   874 F.2d 1036, 1047 (5th Cir. 1989) Issues ..................................................... 35

*Deal v. Hamilton Cty. Bd. of Educ.*
   392 F.3d 840 (6th Cir. 2004) ......................................................................... 14

*Doe ex rel. Doe v. Metro. Nashville Pub. Schs.*
   133 F3d 384 (6th Cir. 1998)......................................................................... 13

*Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*

    137 S. Ct. 988 (2017)................................................................18, 20, 25

*Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*

    Civil Action No. 12-cv-2620-LTB, 2018 U.S. Dist. LEXIS 22111 (D. Colo. Feb. 12, 2018).......................................................................................... 21

*Fry v. Napoleon Cmty. Sch.*

    137 S. Ct. 743 (2017) ....................................................................... 45

*Greenwood v. Wissahickon Sch. Dist.*

    571 F. Supp. 2d 654 (E.D. Pa. 2008) ......................................... 46, 47

*Greer v. Rome City Sch. Dist. B*

    950 F.2d 688 (11th Cir. 1991) ........................................................ 28

*H.L. v Downingtown Area Sch. Dist.*

2015 U.S. App. LEXIS 9742 (3rd Cir. Apr. 24, 2015).................................. 27, 28

*Helen L. v. DiDario*

    46 F.3d 325 (3d Cir. 1995) .............................................................. 47

*K.E. v. Indep. Sch. Dist. No. 15*
    647 F.3d 795 (8th Cir. 2011) .......................................................... 35

*Knable ex rel. Knable v. Bexley City Sch. Dist.*

    238 F.3d 755 (6th Cir. 2001)........................................................... 14

*L.H. v. Hamilton Cty. Dep't of Educ.*

    2016 WL 6581235 (E.D. Tenn. Nov. 4, 2016)........................... 29, 35

iv

*Lillbask v. Conn. Dep't of Educ.*
   397 F.3d 77 (2d Cir. 2005) ................................................................. 15

*Morgan v. Chris L.*
   106 F.3d 401 (6th Cir. 1997) ............................................................. 21

*Neosho R-V Sch. Dist. v. Clark*
   315 F.3d 1022 (8th Cir. 2003) ............................................................. 2

*Oberti v. Bd. of Educ.*
   995 F.2d 1204 (3rd Cir. 1993) ................................................. *passim*

*Olmstead v. L.C.*
   527 U.S. 581 (1999) .............................................................47, 48, 49

*Penn. Ass'n. for Retarded Children v. Commonwealth*
   334 F. Supp. 1257 (E.D. Pa 1971) ..................................................... 24

*Penn. Ass'n. for Retarded Children v. Commonwealth*
   343 F. Supp. 279 (1972) ................................................................... 24

*Roncker ex rel. Roncker v. Walter*
   700 F.2d 1058 (6th Cir. 1983) ................................................. *passim*

*Schaffer ex rel. Schaffer v. Weast*
   546 U.S. 49 (2005) .................................................................. 16, 17

*T.K. v. N.Y.C. Dep't. of Educ.*
   779 F. Supp. 2d 289 (E.D.N.Y. 2011) ................................................ 15

*T.P. v. Mamaroneck Union Free Sch. Dist.*

    554 F.3d 247 (2d Cir. 2009) ............................................................ 14

*Thomas v. Cincinnati Bd. of Educ.*

    918 F.2d 618 (6th Cir. 1990) ........................................................... 13

*Troy Sch. Dist. v. K.M.*

    2015 U.S. Dist. LEXIS 40970 (E.D. Mich. Mar. 31, 2015)....................29, 43, 44

*Wall v. Mattituck–Cutchogue Sch. Dist.*

    945 F. Supp. 501 (E.D.N.Y. 1996) ............................................. 14, 15

**Statutes**

20 U.S.C. § 1400(c)(5) ......................................................................... 25

20 U.S.C. § 1400(d)(1)(A) ................................................................... 18

20 U.S.C. § 1401(26) ........................................................................... 26

20 U.S.C. § 1412(a)(1)(A)..................................................................... 34

20 U.S.C. § 1412(a)(5) .................................................................24, 25, 26

20 U.S.C. §1412(a)(5)(A) ..................................................................... 23

20 U.S.C. § 1414(d)(1)(A)(i)(II)...................................................... 34, 35

20 U.S.C. § 1414(d)(3)(B)(i) ................................................................ 26

20 U.S.C. § 1414(d)(3)(B)(iv) ............................................................. 26

20 U.S.C. § 1414(d)(3)(B)(v) ................................................................ 26

20 U.S.C. § 1415(i)(2)(B) ...................................................................... 13

29 U.S.C. § 701(b)(1) ............................................................................. 45

29 U.S.C. § 794(a) ........................................................................... 45, 46

42 U.S.C. § 12101(a)(2) .......................................................................... 48

42 U.S.C. § 12132 ................................................................................... 47

42 U.S.C. § 12134 ................................................................................... 48

## Regulations

28 C.F.R. § 35.130(b)(3) ......................................................................... 48

28 C.F.R. § 35.130(d) .............................................................................. 48

34 C.F.R. § 104.33(a) .............................................................................. 46

34 C.F.R. § 104.34(a) .............................................................................. 46

34 C.F.R. § 300.114(a)(2)(ii) .................................................................. 26

34 C.F.R. § 300.115(b)(2) ....................................................................... 26

34 C.F.R. § 300.116(e) ............................................................................ 36

34 C.F.R. § 300.324(a)(2)(i) .................................................................... 20

## Rules

MARSE R. 340.1702 ................................................................................ 34

**Other**

H.R. Rep. No. 94-332, p. 2 (1975)........................................................................ 24

**STATEMENT OF ISSUES**

A.    Is the General Education Classroom A.A.'s Least Restrictive Environment ("LRE") Under the IDEA?

B.    Did the District Violate the LRE Provision of Section 504 and the Integration Mandate of Title II?

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Per the Court's practice guidelines, Plaintiffs have filed their Statement of Material Facts Not in Dispute as a separate document. *See* Dkt. #101.

**STATEMENT OF MATERIAL FACTS IN THE ADDITIONAL EVIDENCE SUBMITTED BY PLAINTIFFS**

**Dr. Kathleen Whitbread**

1.    Dr. Kathleen Whitbread was retained by A.A.'s parents to provide expert testimony in the present action. Dr. Whitbread is a renowned expert in Down syndrome and learning. *See* Exhibit A, p. 1.

2.    Dr. Whitbread has a Ph.D. in Educational Leadership and a M.S. and B.S. in Special Education. She maintains an active, comprehensive special education teaching license for K-12 in Connecticut as well as Associate level certification in Orton Gillingham reading methodology from the Academy of Orton Gillingham Practitioners and Educators. *Id.*

3.    Dr. Whitbread has 14 years of experience as a teacher and researcher at the university level and is currently a tenured associate professor of education and a Fellow of the Institute for Autism and Behavioral Studies at the University of Saint

1

Joseph ("USJ") in West Hartford, CT. She teaches graduate and undergraduate courses in special education, including courses on curriculum and instruction, Universal Design for Learning, assessment, positive behavior support, and collaboration. *Id.*

4.     Dr. Whitbread directs an assessment clinic for children with Down syndrome where teacher candidates conduct academic assessments under her supervision. She has been the education advisor to the Connecticut Down Syndrome Congress since 2007. *Id.*

5.     Dr. Whitbread is currently directing a project funded by the Global Down Syndrome Foundation to support the literacy development of elementary age students with Down syndrome through an after-school tutoring program. Prior to coming to USJ, she was the Associate Director of the Center for Excellence in Developmental Disabilities at the University of Connecticut, where she held joint faculty appointments in the departments of pediatrics and special education. *Id.* at 2.

6.     While at the University of Connecticut, Dr. Whitbread directed research and training projects focused on inclusion of children with intellectual disabilities in general education settings, including a number of multi-year, grant funded projects focused on assisting school districts to increase compliance with the Least Restrictive Environment mandate of the Individuals with Disabilities Education Act. In addition to her work in inclusive education, Dr. Whitbread has

conducted research on the literacy development of children with Down syndrome as well as school-wide positive behavior support. She maintains a blog, Open Books Open Doors, through which she disseminates research-based strategies for teaching reading to children with intellectual disabilities. *Id.*

### Facts about A.A. from Dr. Whitbread's Declaration

7. A.A. has a mild cognitive impairment but he is not a "slow learner." *See* Exhibit B, p. 14, 18.

8. A.A. does not exhibit markedly poor judgment for a child his age and does not engage in markedly more impulsive behavior than other children his age. *Id.* at 18.

9. A.A. is an inquisitive, enthusiastic learner who wants to be in school and enjoys being with other children. He has a solid foundation of communication skills and social skills and he interacts positively with other children without disabilities. *Id.* at 128; Exhibit A, p. 5.

10. Although A.A.'s verbal language is delayed, he is able to effectively communicate with peers and adults using gestures and sounds and is patient when people need time to figure out exactly what he means. Exhibit B, pp. 52-53.

11. A.A. is very socially competent. He is capable of age-appropriate interactions with other children and has developed relationships and friendships in his classroom. *Id.* at 53-54.

12.    The skills outlined in A.A.'s IEP are most efficiently and effectively learned in a general education setting. Exhibit A, p. 5.

13.    All of the goals in A.A.'s IEP can be addressed in a general education setting by appropriately trained personnel. *Id.* The goals in A.A.'s behavior intervention plan ("BIP") can also be addressed in the general education setting. Exhibit B, p. 146.

14.    A.A. is capable of making meaningful progress in the general education classroom with appropriate supports and services, including a modified curriculum and paraprofessional assistance. Exhibit A, pp. 10-11.

15.    A.A. requires repeated opportunities to practice new skills and skills that may be difficult for him. The best way to do that is to embed multiple chances into natural routines. This can be done naturally for all students.  Exhibit B, pp. 124-25, 134.

16.    A.A. requires a communication device in order to communicate more effectively with others. Teachers need training on how to facilitate the use of such a device in the classroom. *Id.* at 139-140.

### Dr. Whitbread's Evaluation of A.A.

17.    An independent educational evaluation of A.A. was completed by Dr. Whitbread in September 2017. Dr. Whitbread reviewed A.A.'s education records,

assessed A.A.'s literacy skills, conducted interviews with A.A.'s parents, and observed A.A. in his educational placement at St. William. Exhibit A, pp. 3-4.

18.   Dr. Whitbread found no evidence that A.A. cannot benefit from placement in a general education setting and overwhelming evidence that he can. *Id.* at 7.

19.   Dr. Whitbread concurred with Dr. Quirk that the following supports and services can be implemented in the general education classroom: (1) communication instruction and an AAC device; (2) a behavior plan and visual supports; (3) social skills instruction; (4) professional development and collaborative planning for teachers and support staff. (Declaration, p. 6). Dr. Whitbread stated that these are necessary components to an appropriate education for A.A. Exhibit B, p. 60.

20.   Dr. Whitbread also recommended: (1) for the general education teachers, not just special education teachers, to receive training on Applied Behavioral Analysis and use of the AAC device; (2) provide A.A. systematic, explicit instruction in reading; (3) confront "refusal to participate" behavior by varying materials, instructional strategies and reinforcers, because it is more likely that his "refusal" is instead a reaction to the instructional methods not being well-matched to his learning needs; and (4) use embedded instruction in the general education classroom, which involves repeating skills within the ongoing routines of a typical lesson or classroom. Exhibit A, p. 6.

21.   During Dr. Whitbread's observation of A.A., he did not exhibit any behaviors that would warrant placement outside the general education setting. *Id.* at 8. There is no reason a behavior intervention plan cannot be implemented in the general education environment for A.A. *Id.*

### General Facts about Inclusion

22.   Nearly forty years of research shows that children with disabilities learn better when educated alongside their non-disabled, same-age peers.  *Id.* at 10.

23.   The belief that a child must meet grade-level requirements in order to be included in the general education setting is a significant misunderstanding of how placement in general education would work for a child with a disability. Exhibit B, p. 120.

24.   Children with Down syndrome who are included in regular, typical classroom placements have better academic and social outcomes. *Id.* at 126.

25.   Once children are placed in segregated classrooms, they rarely graduate to general education classrooms. *Id.* at 122.

26.   Inclusion in general education should not start with recess, lunch, and classes like art and music because those are the most complex and least structured settings for children to navigate. Bringing a child with a disability in and out of the general education setting for these classes does not create the feeling that the child is part of the general education classroom, but instead creates confusion. *Id.* at 121.

Self-contained classrooms are not, by nature, more structured than general education classrooms. Structure can be introduced into general education classrooms through pre-teaching, re-teaching, overlearning and planning on how to group children together to receive instruction. *Id.* at 123-124.

27.    Children learn all the time, even if they aren't doing exactly what the rest of their class is doing, and even if they can't achieve at grade-level. *Id.* p. 129.

### Dr. Laurie Lundblad

28.    Parents' counsels deposed the District's expert from the due process hearing, Dr. Laurie Lundblad, on February 27, 2018. Exhibit C. The deposition revealed the following material facts.

29.    Dr. Lundblad, does not consider herself an expert in how children with Down syndrome learn. *Id.* at 12. Only once in her professional career has she ever recommended placement of a child with Down syndrome in a regular education class. *Id.* Other than this case, she has never testified on the issue of least restrictive environment for a child with Down syndrome. *Id.* at 16. She has never been a teacher. *Id.* at 10. And she has not contributed any academic literature to the field of Down syndrome and learning. *Id.*

30.    On November 13, 2015, after informing A.A.'s parents that it was terminating the Trial Placement Agreement, the District retained Dr. Lundblad, a

private psychologist, to observe A.A. *Id*. at 19. She did not make a report at this time. *Id*. at 24.

31.     After observations of A.A. in November 2015, Dr. Lundblad gave her opinion to the District that A.A. should be sent to the CI classroom instead of his regular classroom.   However, she did not review A.A.'s IEP before making this recommendation. *Id*. at 22. She agrees it is absolutely essential to *not* make a placement decision for a child without reviewing the child's IEP. *Id*. at 22-23.   She also did not do any testing, or interview A.A., his mother, or the classroom teacher. *Id*. at 23.

32.     Dr. Lundblad recognized that A.A. needed both an AAC device and a behavior intervention plan ("BIP")—regardless of which classroom A.A. was in, i.e., general education or the CI class *Id*. at 21.   She also knew that he did not have an AAC device that was being used in general education and she did not verify whether he had a behavior intervention plan. *Id*.

33.     On or about May 5, 2016, Dr. Lundblad observed A.A. a second time. *Id*. at 24. The District still was not using an AAC device for A.A. *Id*. The District still had not performed a functional behavior assessment or developed a behavior intervention plan for A.A. *Id*. Dr. Lundblad believed he needed both of these supports. *Id*. at 24, 30.   She also had recommended both of them for A.A. in his general education classroom. *Id*. at 37.

8

34.     Dr. Lundblad detailed her observations and recommendations in a report dated May 6, 2016. Dkt. #96-41. Dr. Lundblad compared A.A.'s progress from November, her last observation, to her observation in May.  She found that A.A. progressed in his "ability to participate in instruction," his behavior of lining up and waiting his turn, and his ability to work with printed material. Exhibit C, pp. 26-27. He struggled with his speech, a common problem for children with Down syndrome. *Id*. at 27.

35.     Despite this second observation, Dr. Lundblad cannot recall if she examined A.A.'s actual IEP goals. *Id*. at 24.  Lundblad admits that it is necessary to do so when opining on a student's placement including the least restrictive environment. *Id*. at 22-23.

36.     Although Dr. Lundblad believed A.A. needed the supports of the AAC device and the behavior intervention plan, Dr. Lundblad admits that since he did not receive them in general education there was *no data* to evaluate how A.A. would perform with those supports in general education. *Id*. at 29-30.  Dr. Lundblad admits she never made any recommendation for such supports to be provided to A.A. in general education *before* she recommended that he be moved to the segregated CI classroom. *Id*. at 31-32.

**Molly Horal**

37.    Parents' counsel deposed the District's employee, Molly Horal, on February 26, 2018. The deposition revealed the following material facts.

38.    Molly Horal is the teacher of the Cognitive Impairment ("CI") classroom at Meadowbrook Elementary School where the District proposed to place A.A. Exhibit D, p. 6.  She has taught three years, all of them in the CI classroom. At the time of the due process hearing in the summer of 2016 she had taught one year. *Id*. at 7.  The CI classroom is solely for children with disabilities. *Id*. at 31.  There are not any non-disabled children in this classroom. *Id*.

39.    Ms. Horal has never taught a student with Down syndrome in a regular education classroom. *Id*. at 7-8.  She has not had any training in a regular education classroom where a child with Down syndrome attended. *Id*. at 8.  The school district has not provided her any training on how to integrate a child with an intellectual disability into a regular education classroom. *Id*. at 36-37. She has never taught A.A. *Id*. at 36.

40.    Prior to the due process hearing, Ms. Horal observed A.A. when he was in the kindergarten regular education classroom at Keith Elementary taught by Ms. Juliann Snavely. *Id*. at 9-10.  She also attended an IEP meeting for A.A. in May 2016. *Id*. at 10.

10

41.     At the May 2016 IEP meeting, Ms. Horal recommended placement of A.A. in her CI classroom at Meadowbrook. *Id*. This was not only a separate classroom, but a separate *school*; thus, her recommendation would have removed A.A. from his home school altogether. *Id*. at 11. At the time of her recommendation, Ms. Horal was in her first year of teaching and had never attended an IEP meeting for a child with Down syndrome. *Id*. at 14.

42.     Ms. Horal admits that A.A.'s teacher and staff were not implementing A.A.'s AAC device in the regular education classroom. *Id*. at 11. She says the responsibility to implement it "would have been the responsibility of several individuals" including Ms. Snavely, Chris Franke, the speech and language pathologist, his paraprofessional, the resource teachers, and the ancillary staff. Id. at 12. The general education teacher, Ms. Snavely, advised Ms. Horal that Snavely "didn't know how to use it or how to fit it into her day." *Id*. at 16.

43.     Ms. Horal agrees A.A. needs an AAC device. *Id*.

44.      When she recommended a CI placement at the May 2016 IEP Meeting, she admits A.A. had not received ample opportunities or any instruction using the AAC device. *Id*. at 15.

45.     Similarly, when she expressed her view that A.A.'s placement should be the CI classroom at the May 2016 IEP meeting she cannot recall whether a behavior intervention plan was in place for A.A. *Id*. at 13. She agrees A.A. needs it

11

because he has "refusal behaviors" and "fails to complete tasks." *Id*. at 16. A behavior intervention plan however was not developed or implemented for A.A. in general education during the entire 2015-16 school year.

46.     Ms. Horal agrees that "refusal behaviors" can affect one's ability to meet educational goals. Id. at 17.  Similarly, failing to maintain attention can affect a student's ability to meet goals. *Id*.

47.     Ms. Horal also agrees that the District did not have any data on how A.A. would perform in the regular education classroom *with an AAC device. Id*.

48.     Ms. Horal says A.A.'s skills "were well below the other students in the general education classroom." *Id*. at 21.  She infers that his goals could not be carried out "as they were not in relation to the other peers that would have been in that classroom.  They would not have those goals, and they would not have the same needs as A.A. to work towards those goals." *Id*.  "[H]is level of functioning at that time was not the same as his peers." *Id*. at 22.

49.     When pressed about the goals in the IEP that she believed A.A. could not meet in general education, Ms. Horal stated one math goal and one literacy goal. For math, Ms. Horal said it was being "able to identify eight shapes" by May 11, 2017 with 75 per cent accuracy. *Id*. at 26-27.  The literacy goal was being able to point to corresponding lowercase letters by May 11, 2017 with 80 per cent accuracy. *Id*. at 27.

12

## STANDARD OF REVIEW:  MODIFIED *DE NOVO*

In an IDEA action, "the court (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). The Supreme Court has construed this provision to mean that an initial reviewing court should conduct and independent review and make an independent decision based on the preponderance of the evidence, but also should give "due weight" to the determinations made during the state administrative process. *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 206 (1982).

However, reviewing courts must not "simply adopt the state administrative findings without an independent re-examination of the evidence," *Doe ex rel. Doe v. Metro. Nashville Pub. Schs.,* 133 F.3d 384, 387 (6th Cir. 1998). Reviewing courts must also not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618, 624 (6th Cir. 1990) (quoting *Rowley,* 458 U.S. at 206).

The amount of weight due to administrative findings depends on whether the finding is based on educational expertise. Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation. More weight is due to an

agency's determinations on matters for which educational expertise is relevant. *See Burilovich v. Bd. of Educ. of Lincoln Consolidated Schs.,* 208 F.3d 560, 567 (6th Cir. 2000); *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F3d. 840, 849 (6th Cir. 2005). Issues involving educational methodology are entitled to more weight. *Rowley*, 102 S.Ct. at 3051-52. The issue of whether a student with a disability is being served in the least restrictive environment, i.e. educated alongside his\her non-disabled peers to the maximum extent appropriate, does not involve educational methodology and thus is entitled to less weight. *Roncker ex rel. Roncker v. Walter*, 700 F2d. 1058, 1062 (6th Cir. 1983).

The Sixth Circuit has characterized the above standard of review as a "modified de novo" standard whereby a district court is required to make an independent determination based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings. *Deal*, 392 F3d. at 849; *Knable ex rel. Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 764 (6th Cir. 2001).

Summary Judgment is often used in IDEA actions, however in such cases, it amounts to "more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions." *T.P. v. Mamaroneck Union Free Sch. Dist.,* 554 F.3d 247, 252 (2d Cir. 2009); *Wall v. Mattituck–Cutchogue Sch. Dist.,* 945 F. Supp. 501, 508 (E.D.N.Y. 1996). A district court must

14

base its decisions on the preponderance of the evidence and give due weight to the prior administrative proceedings. *Id.* While the parties may call an IDEA action a Motion for Summary Judgment, it is in substance an appeal of an administrative determination. *Lillbask v. Conn. Dep't of Educ.,* 397 F.3d 77, 83 n. 3 (2d Cir. 2005).

The court is not ruling in a typical Summary Judgment setting, but is instead determining whether the administrative record, combined with additional evidence, establishes compliance with the IDEA. *Wall,* 945 F. Supp. at 508. As the Court stated in *Wall,* "summary judgment appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions where, as here, in addition to the record at the administrative level, additional evidence is submitted to the court. The inquiry, however, is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." *Id.* at 508; *See also T.K. v. N.Y.C. Dep't. of Educ.,* 779 F. Supp. 2d 289, 306-07 (E.D.N.Y. 2011).

Similarly here, Plaintiffs are seeking a review of an IDEA administrative Decision and Order as well as additional evidence presented herein. This will require a resolution of both the disputed issues of law and fact as outlined in the Amended Complaint. Dkt. #7. Determinations involving whether the Administrative Law

Judge ("ALJ") erred in allocating the burden of proof and whether the ALJ failed to apply the proper least restrictive environment legal standard are issues of law appropriately addressed using the standard for Summary Judgment. Conversely, determining whether A.A. received a free appropriate public education ("FAPE") and determining A.A.'s least restrictive environment under the Sixth Circuit's controlling *Roncker* decision and standard requires an examination of disputed issues of fact through a review of the administrative record coupled with additional evidence submitted.

In light of the above jurisprudence and discussion, Plaintiffs' are filing a Motion for Summary Judgment, while respectfully advising the Court that it is a *hybrid form* of Summary Judgment, which allows for a broader inquiry of both disputed issues of law and fact and entails a review of the administrative record and additional evidence.

## ARGUMENT

## I.   SUBSTANTIVE VIOLATIONS OF THE IDEA

## A.   THE ALJ MISALIGNED THE BURDEN OF PROOF

This Court should find that the ALJ improperly placed the burden of proof on A.A. The Supreme Court has held "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed on the party seeking relief." *Schaffer ex rel.*

16

*Schaffer v. Weast*, 546 U.S. 49, 62 (2005). In the present case, the District is the "party seeking relief," as it filed the due process complaint against the Parents. In doing so, the District's goal was to persuade the ALJ to enforce its segregated placement of A.A. in the CI classroom. The Parents merely responded to the District's complaint in order to defend themselves against the erroneous claims made therein.

At the outset of the due process hearing, the ALJ affirmatively stated to the parties that the burden of proof was on the District as the "party seeking relief." The Parents relied on this allocation of burden in presenting their case. It was not until the ALJ published her Order in favor of the District that she first announced she had shifted the burden to the Parents.

As described in Section E, *infra*, the Sixth Circuit standard for determining a student's least restrictive environment, set forth in *Roncker*, counsels in favor of A.A.'s placement in the general education classroom. At the due process hearing, the District did not prove that its proposed placement of A.A. in the segregated CI classroom meets the *Roncker* standard for least restrictive environment. Therefore, if the ALJ had properly allocated the burden of proof to the District and applied the appropriate standard for LRE in the Sixth Circuit, A.A. would have prevailed at the due process hearing.

17

**B.     THE DISTRICT FAILED TO PROVIDE A.A. WITH A FREE APPROPRIATE PUBLIC EDUCATION**

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). School districts must provide children who are eligible for special education under the IDEA with individualized education programs ("IEPs") that are "reasonably calculated" to enable the students to receive educational benefits. *Rowley*, 458 U.S. 176, 206 (1982).

The United States Supreme Court recently expanded upon the definition of FAPE in *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017). The Court held that "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999. In the present case, the District denied A.A. a FAPE during the 2015-2016 and 2016-2017 school years by failing to provide him with appropriate behavior supports and failing to provide needed assistive technology to facilitate communication. Without such supports, it was not possible for A.A. to make progress appropriate in light of his circumstances.

**1.     THE DISTRICT FAILED TO USE A.A.'S COMMUNICATION DEVICE WITH FIDELITY IN THE GENERAL EDUCATION CLASSROOM**

18

Due to A.A.'s speech apraxia – a severe expressive and receptive language disorder that causes difficulty making accurate speech muscle movements while speaking – an AAC device is crucial to assist with communication. Such a device acts as A.A.'s "voice" by allowing him to communicate his wants, needs, and thoughts with his peers and teachers. There was no disagreement between the District and the Parents that an AAC device was needed to achieve A.A.'s IEP goals. All parties – the District's speech-language pathologists who participated in the IEP meetings (Dkt. #96-69, pp. 24, 28, 48), the Parents, the District's consulting expert Dr. Lundblad (*Id.* at 32), and the Parent's consulting expert Dr. Quirk (*Id.* at 42) – found that the AAC was essential. The ALJ concurred, finding that based on the evidence presented at the due process hearing, A.A. "definitely needs an Augmentative Alternative Communication System" as called for in the May 2015 IEP. *Id.* at 47.

Despite this universal agreement as to the need for an AAC device, none were utilized by the District during A.A.'s time in the general education classroom. *Id.* at 48. A.A.'s general education teacher, Juliann Snavely, testified that she did not use the device and did not have adequate training to do so. *Id.* Dr. Quirk did not observe any use of an AAC during her classroom observation of A.A. in July 2016. *Id.* at 42. In addition, Dr. Quirk and Dr. Whitbread confirmed that behavior is a type of

19

communication and acknowledged that any behavior issues A.A. exhibited could be due, in part, to his inability to communicate verbally.

The District's failure to provide an AAC device directly affected A.A.'s ability to communicate and resulted in a denial of FAPE. The ALJ confirmed this in her due process decision, holding that A.A. did not receive FAPE in the general education classroom during the 2015-2016 school year "based on [A.A's] significant behavioral and language needs, which clearly were not met." *Id.* at 26.

## 2. THE DISTRICT DID NOT PROVIDE A.A. WITH AN FBA OR BIP IN THE GENERAL EDUCATION CLASSROOM

Appropriate behavioral supports are essential for children with Down syndrome, such as A.A.[1] Without behavior interventions, A.A. cannot be expected to cure his own behavior or learn the behavioral goals captured in his IEP. A behavior intervention plan ("BIP") is a related service under the IDEA. An IEP team must, "in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 34 C.F.R. § 300.324(a)(2)(i).

Emergent case law under the Supreme Court's *Endrew F.* standard highlights the need for a formal BIP rather than ad hoc attempts to incorporate behavioral goals

---

[1] *See NDSS: Managing Behavior* Available at https://www.ndss.org/resources/managing-behavior/ (last visited March 31, 2018).

into an IEP. On remand from the Supreme Court, the district court in *Endrew F.*

found that the absence of a BIP resulted in a denial of FAPE. Civil Action No. 12-

cv-2620-LTB, 2018 U.S. Dist. LEXIS 22111 (D. Colo. Feb. 12, 2018). While the

school district alleged that a formal BIP was in progress, the court held that such

efforts were insufficient to address the lack of a formal behavioral plan at the time

of the student's IEP proposal:

> The District's inability to develop a formal plan or properly address Plaintiff's behaviors that had clearly disrupted his access to educational progress starting in his second grade year does, under the new standard articulated by the Supreme Court in this case, impact the assessment of whether the educational program it offered to Petitioner was or was not reasonably calculated to enable him to make progress appropriate in light of his circumstances. The District's inability to properly address Petitioner's behaviors that, in turn, negatively impacted his ability to make progress on his educational and functional goals, also cuts against the reasonableness of the April 2010 IEP.

*Id.* at *22-23.

A similar Sixth Circuit case also found a violation of the IDEA where a school

district failed to provide a student with a BIP. *Morgan v. Chris L.,* 106 F.3d 401, 415

(6th Cir. 1997). Like A.A., Chris L. was not afforded "the special education and

supportive and corrective services to which the IDEA entitled him." *Id*. at 16. Other

circuits and district courts in the Sixth Circuit agree that failing to provide a child

with a BIP is a denial of FAPE. *See Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022,

1029-30 (8th Cir. 2003); *B.H. v. West Clermont Bd. of Educ.*, 788 F.Supp.2d 682,

699 (S.D. Ohio 2011).

A.A. was never provided with appropriate behavioral supports in the general education setting, despite the clear indication that he needed such support. The District approached the IEP meeting in May 2015 noting concern for A.A.'s behaviors and behavioral outbursts yet made no effort to conduct an FBA or develop a BIP. Dkt. #96-69 at 25. During A.A.'s trial placement, on October 19, 2015, Ms. Snavely sent an email to the Principal and several members of A.A.'s IEP team requesting assistance in meeting A.A.'s behavioral needs. She received no response. *Id.* at 27. Observations conducted by the teacher consultant, school psychologist, and social worker through the fall of 2015 noted A.A. engaging in intermittent behaviors common to students with Down syndrome, such as defiance and difficulty with staying on task, yet there was still no effort to conduct an FBA or develop a BIP. *Id.* at 28-29.

Instead of providing the supports and services that A.A. needed, the District simply ended the trial placement in November 2015. It was not until March 2016, approximately ten months after A.A.'s initial IEP, that the District requested a meeting with the Parents to discuss conducting an FBA. *Id.* at 30. During that period, it was abundantly clear that A.A. exhibited behaviors common to children with Down syndrome. In fact, the District used A.A.'s behavior *offensively* to justify ending the trial placement and attempting to move him to the segregated CI classroom.

22

The "two most significant areas of concern for [A.A.]" found by the ALJ –

"his communication and behavior" – are the same areas in which the District

deprived him of vital supports, as required under IDEA. Dkt. at 47. Considering that

the District never provided A.A. with an FBA or a BIP, and that the lack of an AAC

device, in turn, reinforced his behavior issues, A.A. was not given the essential

services and supports required to enable him to make progress appropriate in light

of his circumstances. As a result of its repeated failures to provide A.A. with all of

the supports and services he needed, the District denied him a FAPE in its May 2015

and May 2016 IEPs.

## C.   THE LEAST RESTRICTIVE ENVIRONMENT MANDATE OF THE IDEA REQUIRES PLACEMENT IN THE GENERAL EDUCATION SETTING WITH SUPPLEMENTARY AIDS AND SERVICES

The "least restrictive environment mandate" of the IDEA states:

> To the maximum extent appropriate, children with disabilities, including children in public and or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature and severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). *See also Rowley*, 102 U.S. 176, n. 24 (1982).

In contemplating the LRE mandate, some history is useful. In the early 1970s,

"a majority of handicapped children in the United States 'were either *totally*

*excluded* from schools or [were] *sitting idly* in regular classrooms awaiting the time

23

when they were old enough to 'drop out.'" *Rowley,* 458 U.S. 176, 179 (1982) (emphasis added) (quoting H.R. Rep. No. 94-332, p. 2 (1975)).

In 1972, in *Penn. Ass'n. for Retarded Children v. Commonwealth* ("*PARC*"), a district court ordered school districts to provide educational services to all children with disabilities and to provide them due process hearings. 334 F. Supp. 1257 (E.D. Pa 1971) and 343 F. Supp. 279 (1972). This decision became the catalyst for Congress to pass what is now known as the IDEA. *Rowley*, 458 U.S. at 180, n. 2.

There is no doubt about the strong Congressional preference for educating disabled children with non-disabled children, as exemplified by the fact that federal funding to states is conditioned upon bringing children with disabilities back to their non-disabled peers. Before accepting federal money, Michigan must have:

> [P]rocedures to ensure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, ***and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.***

20 U.S.C. § 1412(a)(5) (emphasis added); *Rowley*, 458 U.S. at 176, n. 24.

Thirty years after *PARC* and the passage of the IDEA, Congress returned to the importance of general education for children with disabilities, stating in the 2004 Reauthorization of the IDEA:

Congress finds the following:

24

Almost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by

(A)   having high expectations for such children and ensuring their *access to the general education curriculum in the regular classroom, to the maximum extent possible*;

*(C)*   … children [will] benefit from such efforts and that special education can become a *service for such children rather than a place where such children are sent; and*

**(D)**   *providing appropriate special education and related services, and aids and supports in the regular classroom, to such children, whenever appropriate.*

20 U.S.C. § 1400(c)(5) (emphases added).

Most recently, the United States Supreme Court found that students with disabilities are entitled to an "ambitious" educational program. *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017). The Supreme Court both demanded rigor and was clear about what *cannot* occur: children with disabilities cannot be "receiving instruction that aims so low [that it] would be tantamount to 'sitting idly . . . awaiting the time when they were old enough to 'drop out.'" *Id.*

### D.   THE DISTRICT CANNOT OVERCOME THE LRE MANDATE

The simple, straightforward application of the LRE mandate shows that the District failed to comply with the IDEA in its determination of A.A.'s placement. There is no dispute that the District demanded "special classes, separate schooling or other removal of [a] handicapped child from the regular education environment."

25

20 U.S.C. § 1412(a)(5). It sought to segregate A.A. in a classroom exclusively for children with cognitive impairments.

The District cannot overcome the condition precedent to such a removal — that is, *first* it must provide A.A. the necessary "supplementary aids and services" in regular education to allow him to succeed. It cannot simply presume he will fail. Again, the statute allows A.A. to be removed from the general education setting *only* when regular classes cannot be achieved *with the use of supplementary aids and services . . .*" 20 U.S.C. § 1412(a)(5) (emphasis added); 34 C.F.R. § 300.114(a)(2)(ii).

"Supplementary aids and services" include positive behavioral interventions and supports, 20 U.S.C. § 1414(d)(3)(B)(i), communication services, 20 U.S.C. § 1414(d)(3)(B)(iv), assistive technology, 20 U.S.C. § 1414(d)(3)(B)(v), and "related services," which are defined as "developmental, corrective, and other supportive services" and include speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, social work services, school nurse services, counseling services, orientation and mobility services, and medical services. 20 U.S.C. § 1401(26). As the IDEA regulation says, supplementary aids and services must "be provided *in conjunction with regular class placement.*" 34 C.F.R. § 300.115(b)(2) (emphasis added). They cannot be separated.

The Third Circuit's bellwether decision of *Oberti v. Bd. of Educ.* is instructive. 995 F.2d 1204 (3rd Cir. 1993). It is virtually the same as the present case, only 25 years earlier. In *Oberti*, the child, Rafael, was an elementary school student with Down syndrome, just like A.A., who occasionally had behavior issues in school. Akin to the present case, these behaviors frustrated Rafael's teacher, yet, as with A.A., "Rafael's IEP provided no plan for addressing Rafael's behavior problems." *Id*. at 1208. Just as the District has done here, Rafael's school recommended he be placed in a segregated special education class, largely based on his behavior issues. *Id*.

Applying the LRE mandate of the IDEA, the Third Circuit Court of Appeals rejected the school's reasoning. With respect to the continuum of placements, the Court held that it is not an "all or nothing educational system" between regular education and separate classes.  *Id.* at 1218.  Rather, the school first "*must* consider the whole range of supplemental aids and services, *including resource rooms and itinerant instruction.*"  *Id*. at 1216 (emphasis added).  *See also, H.L. v Downingtown Area Sch. Dist.*, 2015 U.S. App. LEXIS 9742 at **9-10 (3rd Cir. Apr. 24, 2015) ("As we noted in *Oberti*, if a school 'has given no serious consideration to including the child in a regular class with such supplementary aids and services and to modifying the regular curriculum to accommodate the child, then it has most likely violated'

the LRE requirement."); *Greer v. Rome City Sch. Dist. B,* 950 F.2d 688 (11th Cir. 1991).

There is no dispute that the District wanted to move A.A. to a special class without first providing him the "supplementary aids and services" of an AAC device or a behavior intervention plan in a regular education classroom. Even the District's "expert," Dr. Lundblad, concedes this point. Exhibit C, pp. 31-32.

Rather, the District just *assumed* that A.A. could not perform in regular education even if he were provided the supports he needed. Such presupposition -- whether analyzed procedurally as a "predetermination" or substantively under the plain language of the LRE mandate - clearly violates the IDEA. The District violated A.A.'s rights by demanding he be removed to a separate class, much further down the "continuum of placements" contemplated by the IDEA, without first giving him the supports he needed in the general education setting.

## E.    THE DISTRICT CANNOT OVERCOME THE *RONCKER* STANDARD

While the LRE mandate of the IDEA speaks definitively on its own, the Sixth Circuit's decision in *Roncker* provides the governing standard in this Circuit for cases that involve questions of LRE. 700 F.2d 1058 (6th Cir. 1983). In this case, the ALJ ignored the *Roncker* standard when considering A.A.'s placement.

The test developed by the Sixth Circuit in *Roncker* asks whether the proposed segregated facility is truly superior for the child and, even *if* it is, then evaluates

28

"whether the services which make that placement superior could be feasibly provided in a non-segregated setting. If they can, the placement in the segregated school would be inappropriate under the Act." *Id*. at 1063.

Recent district court decisions in Michigan and Tennessee have used *Roncker* to set forth legal elements for assessing least restrictive environment. In the Michigan case, the elements were described as follows:

1. Whether the disabled student would benefit from inclusion in general education;

2. Whether such benefits would be outweighed by benefits that are not provided in an inclusive setting; and

3. Whether the disabled child disrupts the general education setting.

*Troy Sch. Dist. v. K.M.,* 2015 U.S. Dist. LEXIS 40970, at *22-27 (E.D. Mich. Mar. 31, 2015). In the Tennessee case, the elements are essentially the same:

1. Could L.H. benefit from mainstreaming?

2. Are the non-portable benefits of mainstreaming far outweighed by the benefits of a non-mainstream setting?

3. Was L.H. too disruptive?

*L.H. v. Hamilton Cty. Dep't of Educ.*, 2016 WL 6581235 (E.D. Tenn. Nov. 4, 2016).[2]

---

[2]    Plaintiffs' counsel, Mr. Gilbert, and Plaintiffs' expert, Dr. Whitbread, assisted the child with Down syndrome in *L.H.*

29

Below, Plaintiffs apply these elements to the present issue of A.A.'s least restrictive environment – something the ALJ failed to do in making her determination at due process. Had the ALJ engaged in this analysis, she would have determined that the general education classroom is A.A.'s least restrictive environment.

## 1.   A.A. BENEFITS FROM INCLUSION IN THE GENERAL EDUCATION SETTING

Thirty years of research on the benefits of inclusion for students with Down syndrome, as catalogued in Dr. Whitbread's declaration, cannot be ignored, as the District and ALJ did here. Exhibit A, p. 10. As to A.A. personally, not only *can* he benefit from inclusion, the evidence is overwhelming that A.A. *did* benefit from inclusion in the general education setting.

### a.   Evidence that A.A. has Benefitted from Placement in the General Education Setting

First, Ms. Julianne Snavely, the general education classroom teacher who had the most contact with A.A., testified that he made progress towards his IEP goals while he was in her class during the 2015-2016 school year. Dkt. #96-13, p. 44.  He made progress academically, socially and behaviorally, and even learned skills beyond what was written in his IEP. *Id*. He also benefitted from a paraprofessional's assistance in the classroom. *Id*. at 42. Thus, Ms. Snavely recommended that A.A. remain in general education with the appropriate supports because he was making

progress toward his IEP goals. *Id.* at 45. She testified that his needs could continue to be met in a 1st grade general education placement. *Id.*

Second, the District's "expert," Dr. Lundblad, testified in her deposition that A.A. progressed in his "ability to participate in instruction," his behavior of lining up and waiting his turn, and his ability to work with printed material. Exhibit C, pp. 26-27. In making her recommendation to move A.A. to the CI classroom, at no time did Dr. Lundblad examine—or apparently even *know*—A.A.'s IEP goals. Exhibit C, p. 22. Even Dr. Lundblad was forced to admit that awareness of a student's IEP goals is necessary in order to determine his least restrictive environment. *Id.* at pp. 22-23.

Third, Plaintiffs' inclusion expert, Dr. Carol Quirk reviewed A.A.'s May 2015 and May 2016 IEPs, performed a classroom observation of A.A. at Keith Elementary, as well as an observation of the segregated CI classroom. Dkt. #96-10, p. 8. Based on her observation of A.A. and extensive experience working with school districts to create inclusive educational programs for children with disabilities, she concluded that A.A. was "interacting in instructional lessons . . . in the general education classroom in the same way as other students, enjoying it and appreciating it and responding to the teacher sometimes just like other students . . . to the extent that other students were also benefitting, he was benefitting as well." *Id.* at 11. Dr.

Quirk concluded that there was no reason why A.A. could not be educated in the general education classroom with his peers. *Id.* at 11, 15.

Fourth, Plaintiff's expert on inclusive education for children with Down syndrome, Dr. Kathleen Whitbread, flew to Michigan to observe and test A.A. and provided detailed expert opinions. Answering the first *Roncker* question, Dr. Whitbread stated that she saw "no evidence that A.A. cannot benefit from placement in a general education setting and overwhelming evidence that he can." Exhibit A, p. 7. She explained that A.A. has the enthusiasm, along with the "solid foundation of communication skills and social skills," to benefit from inclusion. *Id.* at 5. She also pointed out that A.A. interacts positively with children without disabilities. *Id.*

Unlike Dr. Lundblad, who never reviewed A.A.'s IEP, Dr. Whitbread examined every IEP goal and confirmed that all of them could be addressed in the general education setting. Dr. Whitbread addressed references in A.A.'s record to him not meeting academic goals due to "refusal to participate" by saying that it is more likely that his 'refusal' is instead a reaction to the instructional methods not being well-matched to [A.A.'s] learning needs." *Id.* at 6. She recommended multiple alternate methods and strategies that could be used to help A.A. learn in the general education classroom. In fact, she stated that the skills outlined in A.A.'s IEP are "most efficiently and effectively learned in a general education setting." *Id.* at 5. Thus, Dr. Lundblad's statement, given credence by the ALJ, that "opportunities to

learn in the general education classroom are beyond A.A.'s language abilities, his cognitive and intellectual abilities, his processing speed and his working memory" (Dkt. #96-69, p. 48) is inaccurate. Exhibit A, p. 5.

Finally, Dr. Whitbread explained that A.A.'s challenging behaviors are not uncommon for young children with Down syndrome. *Id.* at 8.  She rejected the notion of the District's BCBA, Aubry Dodge, that A.A.'s behavior intervention plan ("BIP") must be implemented in a controlled setting as a reason to justify a segregated placement. *Id.* at 9. In fact, she confirmed that A.A. would benefit from implementation of his BIP in the general education setting, stating:

> A.A. must learn how to control his behavior in the real environment, among non-disabled peers, where he will ultimately be expected to demonstrate positive, pro-social behavior . . . Teaching and reinforcing skills within natural contexts is critical for promoting generalization of these skills across settings. In addition, research has shown that children with Down syndrome learn-prosocial behavior by observing and imitating the behaviors of their [non-disabled] peers.

*Id.* at 9.

Given the testimony of A.A.'s general education teacher and that of renowned experts Dr. Quirk and Dr. Whitbread, it is clear that A.A. can benefit from and make progress in the general education setting.

### b.    The ALJ Used the Wrong Standard for Progress

The ALJ acknowledged that A.A. made progress in the general education setting, however she disregarded this obvious benefit and instead applied an

33

erroneous standard that is at odds with the IDEA and legal precedent. The ALJ focused on whether A.A. could meet the first grade curriculum for non-disabled peers, rather than whether he could make progress towards his unique IEP goals. She says so, in black and white:

> Respondents correctly point out that Student made progress on his IEP goals including his academic goals while in the general education classroom. While it is true that Student made progress on his particular goals, the goals in the IEP are significantly below the first grade curriculum. Therefore, it is unlikely that Student would have any meaningful participation in the first grade curriculum in the general education classroom.

Dkt. #96-69, p. 52.

This finding of progress on his IEP goals should have favored A.A. and largely resolved the case.  However, the ALJ applied a standard of exclusion for A.A. rather than inclusion. She penalized him for having goals below the first grade curriculum when the IDEA *contemplates* that children with disabilities may lag behind the grade-level curriculum of their peers. It is for this reason that the IDEA applies to children with disabilities until they reach age 21, rather than 18, the age of majority. 20 U.S.C. § 1412(a)(1)(A). In Michigan, special education extends even further, until age 26. MARSE R. 340.1702.

Under the IDEA, IEP goals implemented in the general education setting need not be *at* the applicable general education curriculum level, but rather "designed to meet the child's needs that result from the child's disability to enable the child to

34

be *involved in* and *make progress* in the general education curriculum." 20 U.S.C. § 1414(d)(1)(A)(i)(II) (emphasis added); *See also L.H. v. Hamilton Cnty. Dep't of Educ.*, 2016 WL 6581235 at 48-49 (*citing K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 810 (8th Cir. 2011)); *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1047 (5th Cir. 1989); *A.S. v. Norwalk Bd. of Educ.*, 183 F. Supp. 2d 534, 546 (D. Conn. 2002). Thus, the appropriate standard by which to measure whether A.A. can benefit from inclusion is not equivalency to the general curriculum for his typical peers, but whether he can make progress on his own IEP goals with the necessary supplementary aids and services.

The ALJ's error in this case is tantamount to that in *L.H.*, where the child with Down syndrome was also held to grade level standards in order to remain included. Finding that this standard ran counter to the law, the district court in *L.H.* explained:

> [i]f a child's current level of performance is the ground, and the general-education grade-level standard is the roof, special-education supports and services provided pursuant to an IEP are intended to function as a ladder upon which a child can climb from his or her current level of performance *toward* the general-education curriculum.

> Sticking with this analogy, the relevant question is how far and how fast a child must climb that ladder to remain in the regular-education classroom. The language of [the IDEA] . . . strongly implies that IEP goals need not be pegged to the top of the ladder, with mainstreaming predicated on achieving those goals. Rather, IEP goals should be set as far up the ladder as the child can reasonably be expected to progress within one school year.

*L.H.*, 2016 WL 6581235 at 48.

Finally, the ALJ's reasoning is at odds with the IDEA's regulation that a school district cannot remove a child with a disability from regular education classrooms solely because of needed modifications to the general curriculum. 34 C.F.R. § 300.116(e).

In sum, the ALJ's factual finding of A.A.'s progress in general education favors inclusion under *Roncker*. The ALJ's legal application is clearly incorrect based on the IDEA and case precedent.

### 2. THE SEGREGATED SETTING IS NOT SUPERIOR, AND ANY PERCEIVED BENEFITS OF THE SEGREGATED SETTING CAN BE PROVIDED IN THE GENERAL EDUCATION SETTING

The segregated CI classroom is not superior to general education for A.A. In fact, there are significant benefits to immersion with non-disabled peers in general education that cannot be replicated in a more segregated setting without the same access to peers.

> The court must pay special attention to those unique benefits the child may obtain from integration in a regular classroom which cannot be achieved in a segregated environment, i.e., the development of social and communication skills from interaction with nondisabled peers . . . As IDEA's mainstreaming directive makes clear, Congress understood that a fundamental value of the right to public education for children with disabilities is the right to associate with nondisabled peers.

*Oberti*, 995 F.2d at 1216-17. For a student like A.A., the development of social and communication skills is paramount to his receipt of a FAPE.

The ALJ found, and Dr. Quirk agrees, that having one-on-one time for speech therapy is beneficial. Dkt. #96-10, p. 32. However, Dr. Quirk noted that in-classroom time with verbal students is complementary, not contradictory, to speech therapy and that both one-one-one time and in-classroom time with verbal students can happen in a general education setting. *Id.*

Furthermore, as Plaintiffs' experts have attested, the purported benefits of the CI classroom would not truly be beneficial for A.A. For example, the small class size in the CI classroom would not translate to quicker learning for A.A. As Dr. Quirk notes, "being in a self-contained classroom is not going to be more academically beneficial." Dkt. #96-10, p. 37. Nor does the CI classroom staff come prepared with all the training required to facilitate the use of A.A.'s needed communication device. As Dr. Quirk noted, all staff – both those in general education and in special education – would need to be trained on the use of the AAC device. *Id.* at 10, 31.

There are also significant detriments inherent to the CI classroom. The difference in the two environments does not solely hinge on the difference in supports offered; rather, the nature of a segregated versus a mainstreamed environment can also affect the ability of a student like A.A. to learn. The CI classroom environment does not offer the same or as many opportunities for learning. As Dr. Quirk recognized, self-contained classrooms have more down time

37

and more distractions than the general education environment. *Id.* at 16-17. Time spent in the segregated setting also lessens the time available to learn from non-disabled peers. *Id.*

Social interaction is also harmed: Dr. Quirk explained that the CI classroom does not offer the ability for social interaction with typically-developing peers. *Id.* at 16. There is, too, a negative impact on a student's sense of self when they are segregated from the general education environment. As Dr. Quirk notes, when a student is removed, it communicates to the student that they are less valued, or that they are different – with consequential effects on their sense of self. *Id.* at17.

As such, it is clear that the segregated setting is not superior for A.A. Even if the CI classroom were considered superior, such a finding does not indicate that such a restrictive placement is appropriate. To meet the second category of *Roncker* there must also be a finding that the services which make the CI classroom superior are incapable of being "feasibly provided in a non-segregated setting." 700 F.2d at 1063. In this case, any perceived advantage certainly can be brought into the general education classroom.

The ALJ's finding that the CI classroom was superior reflects a bias against inclusion that the Sixth Circuit warned of in *Roncker*.

The perception that a segregated institution is academically superior for a handicapped child may reflect no more than a basic disagreement with the

38

mainstreaming concept. Such a disagreement is not, of course, any basis for not following the Act's mandate.

700 F.2d at 1063. This bias on the part of the District is certain. The District never attempted to provide A.A. with the supports he needed in the regular education classroom. Dr. Lundblad admitted that she never even reviewed A.A.'s IEP goals before concluding that a segregated setting was superior. Exhibit C, p. 22.

Significantly, the CI classroom was favored by the ALJ due to the relative lack of experience and training of general education teachers in implementing inclusive practices, as compared to that of the CI classroom staff. Dkt. #96-69, pp. 49-51. However, the lack of inclusive practices and training of general education teachers is the fault of the District, not A.A. Such administrative issues are not permissible factors in determining LRE. *Bookout v. Bellflower Unified School District*, 63 IDELR 4 (C.D. Cal. 2014) (a school district's failure to provide general education teachers with training on autism and other disabilities did not justify its proposal to place a child with autism in a special day class).

As explained by Dr. Whitbread, the District's belief that supports for A.A. are better delivered in a special classroom, not the regular education classroom, stands in contrast to nearly forty years of research and evidence that, with appropriate supports and services, children with disabilities learn *better* when educated alongside their non-disabled, same-age peers. Exhibit A, p. 10. Dr.

Whitbread's analysis perfectly tracks with the concern of a bias against inclusion,

articulated in *Roncker*:

> These supports (e.g. AAC devices and ABA principles) must be delivered in the general education classroom if inclusive education is to be successful. Otherwise, these services and supports will be available only in more restrictive environments.
>
> While regular education teachers may not be as familiar as special educators with the implementation of ABA principles, understanding how these principles apply to positive behavior interventions and supports is within their field. It is incumbent upon the school district to offer in-service training to regular education teachers and paraprofessionals to understand how such supports and services can be delivered within regular education settings. Otherwise, every child with a disability will be subject to the argument that "the CI classroom is where we do that."
>
> A phrase often referenced in the field of education is that "special education is *not* a place." But for that to be true, supports and services must be brought to the child with a disability rather than taking the child to the support or service. Thus, the District must implement training for regular education teachers for inclusive education to be successful.

Exhibit A, pp. 6-7.

The District was unable to point to a particular perceived benefit of the CI

classroom. Rather, as the ALJ wrote, the District had a global view that

"opportunities to learn in the general education classroom are beyond A.A.'s

language abilities, his cognitive and intellectual abilities, his processing speed and

his working memory." Dkt. #96-69, p. 48. However, as discussed in Section

E.1.b., *supra*, those beliefs are owing to the wrong standard of holding A.A. to the

general curriculum, not his own IEP goals. Both parties' experts agree that A.A.'s

IEP goals can be addressed in the general education setting by appropriately

40

trained personnel. Dkt. #96-10, p. 40. As the Third Circuit held in *Oberti*:

> [A] determination that a child with disabilities might make greater *academic* progress in a segregated, special education class may not warrant excluding that child from a regular classroom environment. We emphasize that the Act does *not* require states to offer *the same* educational experience to a child with disabilities as is generally provided for nondisabled children. *See* [*Bd. of Educ. v.*] *Rowley*, 458 U.S. [176,] 189 [(1982)]. To the contrary, states must address the unique needs of a disabled child, recognizing that that child may benefit differently from education in the regular classroom than other students. *See Daniel R.R.*, 874 F.2d at 1047. In short, the fact that a child with disabilities will learn differently from his or her education within a regular classroom does not justify exclusion from that environment.

*Oberti*, 995 F.2d at 1216-17 (internal citations omitted).

As Dr. Whitbread explains, the District must train teachers to successfully include students with Down syndrome in the general education classroom. Teachers "will require an understanding of curriculum modifications and accommodations, working with paraprofessionals, implementing behavior interventions and supports, and accepting that the goals of a student with Down syndrome may not be *exactly* the same as those of non-disabled students. It also requires regularly scheduled time to collaborate with special education teachers and service providers." Exhibit A, p. 10 (emphasis added).

The ALJ, the classroom teacher, Dr. Lundblad, Dr. Quirk, and Dr. Whitbread all agree that A.A. can make progress on his IEP goals in regular education. Dkt. #96-10, p. 40. Thus, the premise that A.A. can only do so in a segregated classroom

41

falls away.  There is nothing about the CI classroom that cannot also be delivered in

a *less restrictive* regular education classroom.

In summary, any perceived benefits of the segregated setting can also be

provided in the general education setting. By contrast, there are substantial benefits

to being mainstreamed in the general education that A.A. would not receive in the

CI classroom. Thus, the CI classroom is not superior for A.A. and the second factor

of the *Roncker* test counsels in favor of inclusion.

### 3. A.A. WAS NOT TOO DISRUPTIVE IN THE GENERAL EDUCATION SETTING

While A.A. had some behavior challenges at school, that is not unusual for

children his age, especially children with Down syndrome. Per the National Down

Syndrome Society (NDSS), "typical" behavioral challenges for young children with

Down syndrome include wandering/running off, stubborn/oppositional behavior,

attention problems, and obsessive/compulsive behaviors.[3] Exhibit A, p. 8.

Even though A.A. had occasional behavior issues, such behavior did *not*

interfere with or disrupt the learning of others in the general education classroom.

Dr. Quirk confirmed this to be true during her observation. Dkt. #96-10, p. 18. Ms.

Snavely, A.A.'s kindergarten teacher, agreed, stating that A.A.'s behavior was not

---

[3] *NDSS: Managing Behavior: What Are Some Behavioral Challenges Typical in Persons with Down Syndrome?* https://www.ndss.org/resources/managing-behavior/ (last visited March 31, 2018).

disruptive or out of ordinary for students A.A.'s age. *See generally* Dkt. #96-13, p. 41-42. Dr. Whitbread also concurred, based on her observation and review of A.A.'s behavior reports. During her six-hour observation of A.A. in his current placement at St. William, Dr. Whitbread "observed no significant behavioral concerns and certainly no behaviors that would warrant placement in a more restrictive placement." Dkt. #96-10, p. 8.

Significantly, any behavior issues exhibited by A.A. cannot be discussed without acknowledging that the District failed to conduct an FBA or provide a BIP. *See* Section B.2, supra. As the Third Circuit explained in *Oberti*:

> In considering the possible negative effect of the child's presence on the other students, the court must keep in mind the school's obligation under the Act to provide supplementary aids and services to accommodate the child's disabilities. An adequate individualized program with such aids and services may prevent disruption that would otherwise occur.

995 F.2d at 1217. By neglecting to provide A.A. with an FBA or a BIP, the District failed to analyze why behavior issues may have been occurring and shirked its responsibility to teach A.A. how to behave appropriately in various social situations. In fact, the ALJ acknowledged that "the general education classroom staff's actions inadvertently increased the disruptive behaviors rather than addressed them." Dkt. #96-69, p. 51. The District cannot use any negative behaviors against A.A. without first providing behavior supports. *See Troy Sch. Dist. v. K.M.,* 2015 U.S. Dist.

43

LEXIS 40970 at *26-27 (E.D. Mich. 2015) ("[a]lthough K.M. has disrupted the general education setting, those incidents could be more controlled if the staff was properly trained and the IEP was properly followed"). Therefore, the third and final prong of the *Roncker* test counsels in favor of placement in the general education setting.

## F.    IDEA CONCLUSION

This case is easily analyzed by the LRE mandate of the IDEA itself. The District failed to provide A.A. with a FAPE by denying him the supplementary aids and supports that he needed in the general education classroom – a communication device and a behavior intervention plan – before attempting to change his placement to a more restrictive setting. Having denied him these supports, the District's decision to move A.A. to the CI classroom was inappropriate.

The same conclusion is reached under *Roncker*, the prevailing standard in the Sixth Circuit, which the ALJ neglected to consider. First, A.A. made progress towards his IEP goals in regular education, even mastering several goals. While this clearly showed that he benefitted from general education placement, the District and the ALJ held him to an inappropriate standard of success. Second, there is no benefit of the segregated classroom that cannot also be delivered in the general education classroom. Finally, A.A.'s behavior did not rise to the level of disruption contemplated by *Roncker* to merit removal from the general education setting. Thus,

when applying the elements of the Sixth Circuit's *Roncker* test, it is clear that the general education setting is A.A.'s least restrictive environment.

## II.   SECTION 504 AND TITLE II OF THE ADA

Plaintiffs have brought very similar claims of inclusion under Section 504 and Title II of the ADA. As the Supreme Court has recognized, "[t]he same conduct might violate all three statutes—which is why . . . a plaintiff might seek relief for the denial of a FAPE under Title II and §504 as well as the IDEA." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 756 (2017).  Here, Plaintiffs do seek relief for the denial of placement in the least restrictive environment under all three laws. Down syndrome is an intellectual disability which affects the major life activity of "learning," leads to coverage for A.A. under Section 504 and the ADA.

## A.   THE LEAST RESTRICTIVE ENVIRONMENT REQUIREMENT OF SECTION 504

The purpose of Section 504 is to "empower individuals with disabilities to maximize . . . inclusion and integration into society." 29 U.S.C. § 701(b)(1). Section 504 bars all federally funded entities from discriminating on the basis of disability. 29 U.S.C. § 794(a). In relevant part, Section 504 states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial

45

assistance." 29 U.S.C. § 794(a).

The regulations implementing Section 504 adopt language from IDEA, requiring that schools "shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction." 34 C.F.R. § 104.33(a). "[T]here are few differences, if any, between IDEA's affirmative duty" to provide a free appropriate public education and Section 504's prohibition of discrimination. *Greenwood v. Wissahickon Sch. Dist.*, 571 F. Supp. 2d 654, 668 (E.D. Pa. 2008).

Like the IDEA, Section 504 requires the District to provide A.A. with a FAPE. 34 C.F.R. § 104.33(a). Section 504 also has a least restrictive environment provision:

> A recipient to which this subpart applies shall educate, or shall provide for the education of, each qualified handicapped person in its jurisdiction *with persons who are not handicapped to the maximum extent appropriate to meet the needs of the handicapped person.* A recipient shall place a handicapped person in the regular educational environment operated by the recipient *unless it is demonstrated by the recipient that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily.* Whenever a recipient places a person in a setting other than the regular educational environment pursuant to this paragraph, it shall take into account the proximity of the alternate setting to the person's home.

34 C.F.R. § 104.34(a) (emphases added).

Because these same least restrictive goals are found in the IDEA, "it is clear why violations of Part B of the IDEA are almost always violations of the [Rehabilitation Act] . . . When a state fails to provide a disabled child with a free and

46

appropriate education, it violates the IDEA. However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability." *Andrew M. v. Del. Cty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

For all the reasons stated above, the District has violated A.A.'s rights under Section 504 by failing to provide him with a FAPE in the LRE.

## B.   THE INTEGRATION MANDATE OF TITLE II OF THE ADA

Title II of the Americans with Disabilities Act is similar to Section 504 but extends the nondiscrimination rule to services provided by "any public entity," without regard to whether the entity is the recipient of public funds. 42 U.S.C. § 12132. For this reason, "the law developed under Section 504 of the Rehabilitation Act is applicable to Title II of the ADA." *Helen L. v. DiDario,* 46 F.3d 325, 330 n.7 (3d Cir. 1995); *Greenwood*, 571 F. Supp. 2d at 667-68.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II further prohibits the unnecessary segregation of persons with disabilities. *See Id.*; *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999).

47

As Congress stated in the findings and purpose section of the ADA, "[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

Like Section 504, Title II also contains a least restrictive environment provision. Specifically, Congress directed the Attorney General to issue regulations implementing Title II of the ADA. *See* 42 U.S.C. § 12134. These regulations require public entities to "administer services, programs, and activities *in the most integrated setting appropriate* to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (emphasis added). Like the IDEA, under Title II the most integrated setting means a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible. Title II's regulations further prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination, including unnecessary segregation. 28 C.F.R. § 35.130(b)(3).

The Supreme Court has held that Title II prohibits the unjustified segregation of individuals with disabilities in the provision of public services. *See Olmstead*, 527 U.S. at 597. Unjustified isolation of persons with disabilities is unlawful

48

discrimination because (1) segregation "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and (2) segregation "severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600-01. The District has violated the integration mandate of Title II of the ADA by attempting to place A.A. in the segregated CI classroom.

## CONCLUSION AND RELIEF REQUESTED

Plaintiffs request a reversal of the ALJ's finding under the IDEA that A.A.'s least restrictive environment is the CI classroom. The CI classroom is *more restrictive* than necessary for A.A., once he is provided the appropriate supports and he is measured by the appropriate standard of progress in the general education classroom—progress towards his unique IEP goals.

Similarly, Plaintiffs request a finding that the District violated the least restrictive environment provision of Section 504 and the integration mandate of Title II of the ADA.

As a result of these findings, Plaintiffs request injunctive, declarative, or equitable relief of reinstatement to the general education classroom with appropriate supports and any further relief to which they may be entitled.

Respectfully submitted,

Dated: April 13, 2018                    _____/s/ Bradley J. Dembs_____

Bradley J. Dembs (P76692)
155 N. Michigan Ave., Suite 715
Chicago, IL 60601
(866) 787-9270
bradspedlaw@gmail.com

Crystal M. Grant (P71488)
University of Michigan Law School
Pediatric Advocacy Clinic
(734) 763-1947
cgrantjd@umich.edu

Justin S. Gilbert (TN Bar No. 017079)
Gilbert McWherter Scott
& Bobbitt, PLC
(423) 499-3044
jgilbert@gilbertfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2018, I electronically filed the above documents with the Clerk of the Court using the CM/ECF System, which will provide electronic copies to all counsel of record in this matter.

_____/s/ Bradley J. Dembs_____

Bradley J. Dembs (P76692)

155 N. Michigan Ave., Suite 715
Chicago, IL 60601
(866) 787-9270
bradspedlaw@gmail.com

50